148 P.3d 1179

HAWAII MEDICAL ASSOCIATION,
Plaintiff–Appellant,

v.

HAWAII MEDICAL SERVICE
ASSOCIATION, INC.,
Defendant–Appellee.

Maxwell Cooper, M.D., and Michon Morita, M.D., on behalf of themselves and all others similarly situation, Plaintiffs–Appellants,

v.

Hawaii Medical Service Association, Inc., Defendant–Appellee.

Nos. 25923, 25924.

Supreme Court of Hawai'i.

Sept. 8, 2006.

Reconsideration Denied Oct. 25, 2006.

Warren Price, III and Rick J. Eichor (of Price Okamoto Himeno & Lum); Robert F. Miller, Honolulu; and Pamela M. Parker, pro hac vice (of Lerach Coughlin Stoia Geller Rudman & Robbins, San Diego); Edith M. Kallas and Joseph P. Guglielmo, pro hac vice (of Milberg Weiss Bershad Hynes & Lerach, New York), on the briefs, for plaintiff-appellant in appeal No. 25923 and for plaintiffs-appellants in appeal No. 25924.

Ellen Godbey Carson and Paul Alston (of Alston Hunt Floyd & Ing), Honolulu, and Robert Carson Godbey and Jess H. Griffiths (of Godbey Griffiths Reis), Honolulu, on the briefs, for defendant-appellee in appeal Nos. 25923 & 25924 Nos. 25923 & 25924.

MOON, C.J., LEVINSON, J., and Circuit Judge BLONDIN, in place of DUFFY, J.; recused; ACOBA, J., concurring and dissenting separately, with whom NAKAYAMA, J., joins.

Opinion of the Court by MOON, C.J.

Inasmuch as appeal Nos. 25923 and 25924 present identical relevant facts and similar legal issues, we consolidated these appeals for purposes of disposition, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 3(b) (2004).[1] Central to both appeals are the interpretation of an arbitration agreement and whether the plaintiffs in both actions have stated claims of unfair methods of competition, in violation of Hawai'i Revised Statutes (HRS) § 480–2 (1993 & Supp.2005), quoted *infra*, and tortious interference with economic advantage.

The parties to appeal No. 25923 are plaintiff-appellant Hawai'i Medical Association (HMA) and defendant-appellee Hawai'i Medical Service Association (HMSA) [hereinafter, the HMA Appeal]. HMA commenced its action against HMSA on its own behalf and on behalf of its "over 1,600 physician members," who are participating physicians in HMSA's physician network. The parties to appeal No. 25924 are plaintiffs-appellants Maxwell Cooper, M.D. and Michon Morita, M.D., who are members of HMA [hereinafter, collectively, the physician-plaintiffs] and defendant-appellee HMSA [hereinafter, the Cooper Appeal].

Each of HMA's physician members became a "participating physician" by individually entering into a Participating Physician Agreement [hereinafter, the PAR Agreement or the Agreement][2] with HMSA to provide medically necessary healthcare services to HMSA's plan members in exchange for HMSA's payments at specified rates. Notably, HMA is not a signatory party to the Agreement. Briefly stated, HMA and the physician-plaintiffs asserted claims against HMSA for violation of HRS chapter 480 and tortious interference with prospective economic advantage, alleging that HMSA's wrongful conduct (1) constituted unfair methods of competition and (2) delayed, impeded, denied or reduced reimbursement owed to HMA's physician members. HMA further alleged that HMSA's wrongful conduct has resulted in direct and substantial harm to HMA and its members.

In the HMA Appeal, HMA appeals from a final judgment of the Circuit Court of the First Circuit, the Honorable Dexter D. Del Rosario presiding, entered on June 6, 2003 in favor of HMSA, pursuant to the May 23, 2003 order granting HMSA's motion for judgment on the pleadings. Specifically, HMA challenges, *inter alia*, the circuit court's rulings that HMA: (1) lacked standing to assert claims on behalf of its physician members because its claims fell within the dispute resolution procedures contained in the PAR Agreement; (2) lacked standing to assert claims on its own behalf because it had not suffered a cognizable injury; (3) was barred from bringing a HRS § 480–2 claim of unfair methods of competition; and (4) failed to allege an actionable claim of tortious interference with prospective economic advantage.

In the Cooper Appeal, the physician-plaintiffs appeal from a separate June 6, 2003 final judgment, also entered by Judge Del Rosario, challenging a separate order of the circuit court, also filed on May 23, 2003, (1) granting HMSA's motion to dismiss or stay the proceedings and to compel individual arbitration

---

1. HRAP Rule 3(b), entitled "Joint or consolidated appeals," provides that:

> If two or more parties are entitled to appeal from a judgment or order and their interests are such as to make joinder practicable, they may file a joint notice of appeal and thereafter proceed on appeal as a single appellant. *Appeals may be consolidated by order of either of the Hawai'i appellate courts upon the court's own motion,* upon motion of a party, or upon stipulation of the parties to the several appeals.

(Emphasis added.)

2. A PAR Agreement

> is a physician's contract with a health plan. It establishes the doctor's rights and responsibilities in providing medical services to insured patients. The [PAR Agreement] will often include the terms of the plan's utilization management and quality assurance programs that establish the process doctors must follow to be reimbursed for patient care they provide under a managed care program.

*Int'l Healthcare Mgmt. v. Hawai'i Coalition for Health,* 332 F.3d 600, 602 n. 2 (9th Cir.2003).

[hereinafter, motion to compel arbitration] pursuant to the PAR Agreement's dispute resolution provision, (2) denying the physician-plaintiffs' discovery requests, and (3) granting HMSA's motion for judgment on the pleadings. Specifically, the physician-plaintiffs contend that the circuit court erred in: (1) concluding that the dispute resolution provision was valid, enforceable, and not unconscionable; (2) ruling that the claims alleged in the complaint fell within the scope of the dispute resolution provision; (3) dismissing the physician-plaintiffs' claims on the ground that they failed to first exhaust the administrative appeal process set forth in the dispute resolution provision; (4) refusing to allow the physician-plaintiffs to conduct discovery; and (5) dismissing their claims of unfair methods of competition and tortious interference with prospective economic advantage.

As discussed more fully herein, we hold that: (1) the claims of unfair methods of competition falls outside the scope of the arbitration clause; (2) the physician-plaintiffs and HMA are entitled to bring their claims in court; (3) the claims of unfair methods of competition based upon HMSA's alleged wrongful conduct *prior* to June 28, 2002 are barred inasmuch as HRS § 480–2(e) (Supp. 2005) does not apply retroactively; (4) because the plaintiffs need not be competitors of, or in competition, with HMSA, the claims of unfair methods of competition based upon HMSA's alleged wrongful conduct *after* June 28, 2002 are not barred; and (5) the physician-plaintiffs and HMA, on behalf of its members, have sufficiently stated claims of tortious interference with prospective economic advantage. Consequently, we affirm in part and vacate in part the June 6, 2003 final judgments entered in the HMA and Cooper Appeals.

## I. *BACKGROUND*

It is undisputed that HMA's physician members, including the physician-plaintiffs, became "participating physicians" with HMSA, a non-profit, mutual benefit society providing health plans for its members, when they entered into individual PAR Agreements. The Agreement, including the dis-

pute resolution provision at issue, was amended in January and September 2000. Article VIII of the Agreement, entitled "Dispute Resolution" [hereinafter, Article VIII or the dispute resolution provision], as amended, provides in its entirety:

## VIII. DISPUTE RESOLUTION

This Article VIII applies to all sections of the Agreement, notwithstanding reference in selected sections.

8.1 Administrative Appeal

(a) Dispute Other Than Termination (Section 7.2) or Immediate Termination (Section 7.3) of This Agreement. If Participating Physician disagrees with a decision by HMSA, Participating Physician shall submit a written request for review by an HMSA review committee composed of practicing physicians within one year of Participating Physician's receipt of notice of such decision. The review committee shall convene within 60 calendar days of HMSA's receipt of the request for review. Participating Physician and one other witness who is also a physician may appear to present evidence or testimony before a review committee. Participating Physician will be notified of the review committee's decision within 10 working days following the hearing.

(b) Termination of This Agreement. Participating Physician shall submit a written request for appeal within 60 calendar days of receipt of a notice of termination from HMSA. A review committee composed of practicing physicians shall convene within 30 calendar days of HMSA's receipt of the request for appeal. Participating Physician may appear to present evidence or testimony before the committee. Either party may, at its option, be represented by counsel or another representative at the appeal. Participating Physician will be notified of the review committee's decision within five working days following the hearing.

(c) Neither HMSA nor Participating Physician shall be represented by an attorney or other representative at the administrative appeal pursuant to this Section 8.1, except as provided in Section 8.1(b) above.

Both HMSA and Participating Physician may be represented by counsel or another representative at arbitration in accord with Section 8.3 below.

8.2 Expedited Benefits Redetermination. Participating Physician may request an expedited redetermination of any HMSA decision to deny payment for a service that has not yet been provided to a Member. Participating Physician shall request an expedited redetermination and provide any additional information requested by HMSA. HMSA shall provide a decision in accord with national timeliness standards set forth in the Provider Handbook. If Participating Physician disagrees with the expedited redetermination decision, Participating Physician shall request an appeal in accord with Section 8.1(a) above.

8.3 Arbitration Upon Exhaustion of Administrative Appeal [ [hereinafter, the arbitration clause] ]. HMSA and Participating Physician agree that, except for disputes related to HMSA's Schedule of Maximum Allowable Charges, any and all claims, disputes, or causes of action arising out of this Agreement or its performance, or in any way related to this Agreement or its performance, including but not limited to any and all claims, disputes, or causes of action based upon contract, tort, statutory law, or actions in equity, shall be resolved by binding arbitration as set forth in this Agreement.

Within 30 calendar days following Participating Physician's exhaustion of administrative remedies described in Sections 8.1 and 8.2 above, Participating Physician shall submit a written request for arbitration to Legal Services at HMSA in Honolulu, Hawai'i. The arbitration shall be conducted by an independent arbitration service mutually selected by HMSA and Participating Physician. If HMSA and Participating Physician are unable to agree upon an arbitration service within 30 calendar days of HMSA's receipt of Participating Physician's request for arbitration, Dispute Prevention and Resolution, Inc., shall conduct the arbitration.

The arbitration shall be conducted by a single arbitrator in accord with the rules of the arbitration service selected above and [HRS] Chapter 658. [3] Each party will pay its own attorney and witness fees. Fees and costs of the arbitrator and the arbitration service may be awarded by the arbitrator as the arbitrator determines is appropriate. If no award is made, fees and costs of the arbitrator and the arbitration service shall be shared equally by both parties. The decision of the arbitrator shall be final and binding on both parties.

8.4 Disputes Related to HMSA's Schedule of Maximum Allowable Charges. Participating Physician may submit a written request for a review of a specific Eligible Charge by HMSA staff. If the Participating Physician disagrees with the staff's review decision, Participating Physician must submit within 60 calendar days of Participating Physician's receipt of the HMSA staff review decision a written request for review by the HMSA fee review committee. The HMSA fee review committee shall be composed of practicing physicians and may submit recommendations for consideration by HMSA. The determination of charges in HMSA's Schedule of Maximum Allowable Charges shall be at HMSA's sole discretion. Participating Physician's right to arbitration does not include the right to contest any charge included in HMSA's Schedule of Maximum Allowable Charges or the fee review process.

(Underscored emphases in original.) [4]

A. *The HMA Appeal*

HMA is a Hawai'i non-profit corporation organized and existing under the laws of

3. In 2001, the legislature enacted new arbitration statutes codified as HRS chapter 658A (Uniform Arbitration Act), replacing HRS chapter 658 (Arbitration and Awards). 2001 Haw. Sess. L. Act 265, § 5 at 821 (repealing HRS chapter 658); 2001 Haw. Sess. L. Act 265, § 1 *et seq.* at 810–20 (enacting HRS chapter 658A). HRS chapter 658A is applicable to agreements to arbitrate made after July 1, 2002. Although the record does not indicate when each participating physician executed the Agreement (with the exception to the physician-plaintiffs, who executed their Agreement in January 1998), the determination as to the applicability of HRS chapter 658 or HRS chapter 658A to the instant case is not dispositive here.

4. The record for the Cooper Appeal contains the executed Agreements of the physician-plaintiffs;

Hawai'i and .is "dedicated to the health of Hawai'i and represent[ing] over 1,600 physician members in Hawai'i."

### 1. The Complaint

On August 8, 2002, HMA filed a three-count complaint, essentially alleging that HMSA engaged in an unfair and deceptive scheme to avoid making timely and complete payments owed to its physician members, who rendered medically necessary healthcare services to HMSA's members. HMA alleged that:

4. [HMSA] has employed a variety of means to effect its improper, unfair and deceptive scheme, including, but not limited to, one or more of the following practices:

[a.] [The] systematic[ ] deni[al of] reimbursement to HMA members for medically necessary services by, *inter alia* [:] (i) routinely and unjustifiably refusing to pay for, or reducing payment for, more than one healthcare service per visit or incident, referred to as "bundling"; (ii) routinely and unjustifiably reducing retroactively the amount of reimbursement remitted to HMA members, referred to as "downcoding"; (iii) routinely and unjustifiably denying increased levels of reimbursement for complicated medical cases which require HMA members to expend extra time and resources on the treatment of the patient referred to as "modifiers"; and (iv) systematically reducing reimbursement rates to HMA members below reasonable levels;

[b.] [The] systematic[ ] deni[al of] payment to HMA members for medically necessary claims to achieve internal financial targets without regard to individual patients['] medical needs by, *inter alia* [:] (i) improperly employing software programs to "profile" physicians and then automatically downcoding procedures and/or denying payment to those physicians identified as purportedly providing "excessive procedures" without any clinical review, oversight or justification; and[ ] (ii) engaging in physician profiling for the purpose of penalizing physicians who provide services in excess of HMSA's arbitrary "targets"[;]

[c.] [The] fail[ure] to provide adequate staffing to handle HMA members['] inquiries. In this regard, HMSA has created and maintains an inefficient administrative system designed to frustrate payment to HMA members by requiring physicians to make excessive telephone inquiries to obtain proper reimbursement of claims[;]

[d.] [R]outine[ ] and unjustifi[ed] fail[ure] to make payments and interest on past-due claims to HMA members in violation of HRS § 431:13–108 [ (2005) [5];]

---

both Agreements are identical in terms, and the physician-plaintiffs did not dispute the existence of the Agreements. However, with respect to the HMA Appeal, the PAR Agreement in the record is that of Dr. Cooper's, the lead plaintiff in the Cooper Appeal, which was explicitly incorporated in the HMA Appeal's record at the circuit court level. HMSA provided sworn testimony that, "while the exact form of HMSA's Agreements varies depending on a variety of factors, all [HMA] [m]embers who are 'participating physicians' with HMSA by virtue of having an HMSA Agreement, have arbitration clauses in their [Agreement] that are identical or substantially similar to the arbitration clause [in the Cooper's Agreement]." HMA agreed that these documents include the operative terms of the PAR Agreements for purposes of this case.

5. HRS § 431:13–108 provides in relevant part:
 **Reimbursement for accident and health or sickness insurance benefits.** (a) This section applies to accident and health or sickness insurance providers under part I of article 10A of chapter 431, mutual benefit societies under article 1 of chapter 432, dental service corporations under chapter 423, and health maintenance organizations under chapter 432D.
 (b) Unless shorter payment timeframes are otherwise specified in a contract, an entity shall reimburse a claim that is not contested or denied not more than thirty calendar days after receiving the claim filed in writing, or fifteen calendar days after receiving the claim filed electronically, as appropriate.
 (c) If a claim is contested or denied or requires more time for review by an entity, the entity shall notify the health care provider in writing or electronically not more than fifteen calendar days after receiving a claim filed in writing, or not more than seven calendar days after receiving a claim filed electronically, as appropriate. The notice shall identify the contested portion of the claim and the specific reason for contesting or denying the claim, and may request additional information; provided that a notice shall not be required if the entity provides a reimbursement report containing the information, as least monthly, to the provider.
 . . . .

[e.] [The] fail[ure] to provide sufficient explanation for its payment denials and reductions[;]

[f.] [The] fail[ure] to properly reimburse HMA members by requiring physicians to submit excessive documentation justifying their claims submissions[;] and

[g.] [The] require[ment] [that] physicians [ ] enter into one-sided [PAR Agreements] in order for them to provide medical care to patients who receive healthcare through [HMSA's] managed care plans.

Consequently, HMA alleged that HMSA's improper, unfair, and deceptive scheme (1) "has deprived [its] members of millions of dollars of lawful reimbursement for healthcare services" rendered to HMSA's members and (2) directly injured HMA because "[it] has been, and continues to be, frustrated by [HMSA's] practice in its efforts to achieve its purpose ... of supporting Hawai'i physicians in providing high quality medical care for all citizens of the State." HMA further asserted that it "has been required to devote substantial time and resources to dealing with the issues concerning [HMSA's] practices." HMA sought injunctive and declaratory relief for violations of HRS chapter 480 [6] and tortious interference with prospective economic advantage. Thereafter, on October 3, 2002, HMSA answered the complaint, contending, *inter alia,* that: (1) HMA lacked standing to pursue claims for its members; (2) HMA lacked standing to pursue claims on its own behalf for the injuries alleged; and, (3) even if HMA had standing, all of the claims in the complaint are subject to binding arbitration pursuant to the dispute resolution provision in the PAR Agreement.

## 2. The Motion for Judgment on the Pleadings

On December 23, 2002, HMSA filed a motion for judgment on the pleadings, seeking to dismiss HMA's claims based on the failure to timely pursue and exhaust mandatory administrative remedies, as well as binding arbitration, and HMA's lack of standing to bring suit on its own behalf and on behalf of its physician members. Specifically, HMSA contended:

First, as HMA admits, all "participating physicians" signed [PAR Agreements] with HMSA. In all these Agreements—subject to minor exceptions of no relevance here—these physicians promised to resolve their grievances against HMSA through administrative remedies and binding arbitration. The Agreements cover everything HMA complains about here. Specifically, every physician agreed to arbitrate disputes arising out of, or in any way related to, the Agreement or its performance, "including but not limited to any and all claims, disputes, or causes of action based on contract, tort, statutory law, or actions in equity." HMA cannot nullify these Agreements by pursuing its members' claim in this court, when they are obligated to proceed elsewhere. The physicians cannot nullify their duty to arbitrate by sending [HMA] into [c]ourt as their surrogate.

Second, and independently, HMA is not a proper representative of its physician members and cannot assert any claims on their behalf here or in arbitration....

Third, HMA has no valid legal claims of its own against HMSA.... HMA has no contractual relationship with HMSA and HMSA owes HMA no duties, as a matter of law.

Fourth, even if HMA could show it had standing to pursue claims for alleged injuries to itself or its members, HMA has no valid claims under HRS [c]hapter 480.

(e) If information received pursuant to a request for additional information is satisfactory to warrant paying the claim, the claim shall be paid not more than thirty calendar days after receiving the additional information in writing, or not more than fifteen calendar days after receiving the additional information filed electronically, as appropriate.

(Bold emphasis in original.)

6. In the complaint, under its first cause of action for HMSA's alleged violation of HRS chapter 480, HMA appears to seek damages, including treble damages, equitable relief, and reasonable attorneys' fees. However, in HMA's prayer for relief and in its opening brief, HMA indicates that it is seeking only injunctive and declaratory relief. Accordingly, for purposes of our discussion, HMA's complaint is viewed as requesting only injunctive and declaratory relief.

Neither HMA nor its members [is a] "consumer" vis-a-vis HMSA, and thus [it] cannot bring claims [of] "unfair and deceptive practices." Moreover, [its allegations] do not involve "competition," much less "unfair competition," and there is, in any event, no private right of action for unfair competition for acts occurring prior to July 1, 2002 [sic [7]].

Finally, HMA has failed to allege actionable tortious interference with prospective economic advantage[.]

On February 5, 2003, HMA filed its opposition to HMSA's motion for judgment on the pleadings. HMA argued, *inter alia,* that it is clear that HMA has standing, both in its own right and on behalf of its members, to pursue its claims to enjoin [HMSA] from engaging in the unlawful conduct challenged in the [c]omplaint. In this regard, HMA alleges that: (i) it has been frustrated in its efforts to satisfy its underlying organizational purpose; and (ii) that [HMSA's] wrongful practices have required [HMA] "to devote the significant resources" to counteract the effects of [HMSA's] wrongful practices. As such, HMA has alleged an adequate injury-in-fact.... In addition, based upon the allegations of the [c]omplaint, and well-established precedent, it is clear that: (i) HMA's members would otherwise have standing to sue in their own right; (ii) the interest HMA seeks to protect are germane to the organization's purpose; and (iii) neither the claim asserted, nor the relief requested, requires the participation of individual HMA members in the lawsuit. Further, HMA asserted that it has stated a claim: (1) under HRS § 480-2 by alleging that HMSA has engaged in a number of systemic, unfair and deceptive acts and practices, resulting in harm to both HMA and its physician members, and that such practices constitute unfair methods of competition; and (2) of tortious interference with prospective economic advantage by alleging that HMSA's conduct was intentional and malicious and that such conduct has disrupted the relationship between HMA's members and their patients in a manner that has imposed financial hardships upon its members. HMA, incorporating the arguments raised in the physician-plaintiffs' memorandum in opposition to HMSA's motion to compel arbitration, discussed *infra,* also contended that (1) whether a duty to exhaust administrative remedies and arbitrate exists is a question of fact that requires discovery and cannot be resolved at this time and (2) the arbitration clause is unconscionable and, thereby, unenforceable. Lastly, HMA contended that, even if the physician members had a duty to exhaust their administrative remedies and arbitrate their claims, HMA would not be precluded from bringing its claims because it was not a signatory to the Agreement.

On March 17, 2003, HMSA countered, reasserting the positions set forth in its motion for judgment on the pleadings, *i.e.,* essentially that:

> HMA has suffered no compensable injury-in-fact[ ] because its claims are wholly derivative from its members physicians. HMA has no contract with HMSA. HMA's members cannot create new claims by creating a "support group" that allegedly helps them in their own dealings with HMSA.
>
> HMA has no representative standing because (1) the physicians' agreement to arbitrate disputes with HMSA prohibits them from bringing these claims in their own right; and (2) proof of HMSA's allegations is dependent upon significant participation by, and evidence from, its members.
>
> HMA's claim under HRS chapter 480 fails because it has not pled, and cannot establish, any direct injury to its "business or property," which is required for "antitrust standing."
>
> HMA has not pled facts sufficient to establish a claim for tortious interference with prospective advantage. It has not alleged that HMSA has wrongfully interfered with any protected relationship.

---

7. Act 229 (2002) amended HRS § 480-2 to provide a private right of action, which "shall take effect upon approval." 2002 Haw. Sess. L. Act 229, § 6 at 918. Act 229 was approved on June 28, 2002. *See* 2002 Haw. Sess. L. Act 229, at 918.

HMA and its physician members have failed to plead exhaustion of non-judicial remedies required under the PAR Agreements.

The circuit court heard oral argument on HMSA's motion on April 10, 2003. At the conclusion of the hearing, the circuit court indicated that it would

take these matters under advisement, and I'm going to issue a ruling by way of minute order. . . .

And what I intend to do is, issue a minute order indicating that the [c]ourt has either been persuaded or concurred with a particular party based on the points and authorities cited in the argument, and whoever's the prevailing party is to prepare an order consistent with their pleadings and their positions stated.

Having prevailed, HMSA submitted a proposed order granting its motion for judgment on the pleadings, to which HMA filed objections on May 19, 2003.

On May 23, 2003, the circuit court filed its order granting HMSA's motion for judgment on the pleadings, essentially adopting HMSA's proposed order. Therein, the circuit court ruled that: (1) HMA's complaint is barred because HMA's physician members have failed to exhaust their administrative remedies under the PAR Agreement; (2) the PAR Agreement is valid, enforceable, and not unconscionable; (3) an arbitration must occur on an individual basis; (4) HMA lacks standing to assert claims (a) on behalf of its members because those members agreed to forego their own rights to a judicial forum for their disputes under the PAR Agreements and (b) on its own behalf because it failed to show a "distinct and palpable inju-

ry" to itself resulting from HMSA's alleged conduct. In addition, the circuit court dismissed HMA's claim of unfair methods of competition because: (1) the legislature did not provide a private right of action for such claim until June 28, 2002, *see supra* note 7; and (2) HMA failed to allege an injury-in-fact for claims occurring after June 28, 2002.[8] The circuit court also dismissed HMA's claim of tortious inference with prospective economic advantage because: (1) HMA's reliance upon the relationships of its members with their patients or prospective patients was not sufficient to state a claim; and (2) neither HMA nor its members have existing contractual relationships with any of HMSA's members inasmuch as such members have the right to seek treatment with another provider for any reason or for no reason.[9]

Final judgment in favor of HMSA was entered on June 6, 2003. HMA filed its timely notice of appeal on June 26, 2003.

### B. *The Cooper Appeal*

#### 1. The Complaint

On August 8, 2002, the physician-plaintiffs filed a four-count class action lawsuit, essentially alleging that HMSA engaged in an unfair and deceptive scheme to avoid making timely and complete payments for medically necessary healthcare services to HMSA's members. The complaint alleged that the action was filed on behalf of the named physician-plaintiffs and on behalf of other HMA physician members "who are, or were, participating physicians in [HMSA's] physician network . . . at any time during the period from August 8, 1996 through the present time[.]" [10] However, nothing in the record

---

8. The May 23, 2003 order also concluded that:

HMA does not have standing to assert claims arising under HRS chapter 480 for "unfair or deceptive acts or practices," because neither HMA nor its members are consumers or other proper parties to bring such claims. HMA has conceded in its legal memorandum that it does not seek to assert claims [of] "unfair or deceptive acts or practices" under HRS § 480–2. (Brackets in original omitted.) Indeed, HMA does not allege a claim of unfair or deceptive acts or practices. Rather, HMA Essentially asserts that HMSA's alleged unfair or deceptive

acts or practices supports its claim of unfair methods of competition.

9. The May 23, 2003 order lastly indicated that the court granted HMSA's request to take judicial notice of all records and files in the Cooper Appeal case.

10. In their prayer for relief, the physician-plaintiffs requested, *inter alia,* that the court "declar[e] that this action is a proper class action and certif[y] an appropriate plaintiff Class pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 23[.]" HRCP Rule 23(c)(1) (2004) provides in

indicates whether the class was certified or whether the action "is to be so maintained." HRCP Rule 23(c)(1), quoted *supra* note 10.

The physician-plaintiffs alleged identical allegations as HMA, that is, that HMSA has effectuated an unfair and deceptive scheme through, *inter alia*, the systematic denial, reduction, or delay of reimbursement to HMA members for medically necessary services. *See supra* section I.A.1. Consequently, the physician-plaintiffs alleged that they and other HMA members "have not received monies to which they are contractually entitled and have been required to expend unreasonable amounts of time and resources in efforts to obtain these monies." The physician-plaintiffs further alleged that HMSA's unfair and deceptive practices, *inter alia:* (1) have imposed "financial hardships on, and in some cases threaten[ed] the continued viability of, [their] practices"; and (2) have threatened "the continuity of care provided to [their] patients[.]" The physician-plaintiffs requested damages for violation of HRS chapter 480 (Count I), unjust enrichment (Count III), and tortious interference with prospective economic advantage (Count IV). They also sought injunctive and declaratory relief (Count II). In its answer to the complaint, filed on October 3, 2002, HMSA contended that all of the physician-plaintiffs' claims were subject to binding arbitration pursuant to the PAR Agreement, quoted *supra.*

### 2. The Motion to Compel Arbitration, the Motion for Judgment on the Pleadings, and the Motion for a Protective Order

On November 20, 2002, the physician-plaintiffs served document requests and interrogatories on HMSA, purportedly in response to HMSA's stated intention to file a motion to compel arbitration. In essence, the request called for the production of all documents "which were generated, refer[red] or relate[d] to the period from August 8, 1996 to the present" concerning:

1. The total number of claims and denials of claims, claims submitted to the administrative appeals process and claims submitted to arbitration;

2. Appeals made pursuant to the [a]dministrative appeal process, including documents concerning: (a) the nature of the appeal; (b) the response to the appeal; and (c) the disposition of the appeal;

3. Grievances and appeals that were submitted to arbitration, including documents concerning the transcript(s) of the arbitration, the outcome, and the names of the arbitrators;

4. The contracting physicians' costs associated with bringing claims pursuant to the procedures described in the arbitration clause and the average amount of the disputed claims;

5. The qualifications of the individuals involved in the administrative appeals and arbitration process;

6. Any negotiations between HMSA and contracting physicians where HMSA has agreed to modify the language or terms of the arbitration clause based on these negotiations; and

7. Information concerning complaints and grievances submitted to defendant, including information concerning defendant's determination to include or exclude certain terms or items from arbitration.

The request for interrogatories sought similar information, *i.e.,* documents and other information from "August 8, 1996 to the present" regarding physician complaints, grievances, inquiries, claim submission, pre-certification requests, appeals, arbitrations, and contract negotiations involving HMSA and any of its participating physicians.

On December 23, 2002, HMSA moved to compel individual arbitration pursuant to the PAR Agreement and to dismiss or, in the alternative, to stay all proceedings. On the same day, HMSA also filed a motion for judgment on the pleadings, arguing that

the pleadings conclusively establish that: (1) [the physician-p]laintiffs have failed to plead that they have exhausted administra-

---

relevant part that, "[a]s soon as practicable after the commencement of an action brought as a

class action, the court shall determine by order whether it is to be so maintained."

tive remedies as required under their agreements with HMSA, but even if they have so pleaded, they would have no standing[;] (2) [the physician-p]laintiffs' claims under HRS [c]hapter 480 [dealing with unfair and deceptive practices, and unfair methods of competition] are barred [inasmuch as they are not "consumers" as required for relief under Chapter 480 and their claims do not involve "competition"]; (3) [the physician-p]laintiffs' claims [of] unjust enrichment are defective as a matter of law [because unjust enrichment is an action in quasi-contract and there is a valid and express contract here]; and (4) [the physician-p]laintiffs claims [of] tortious interference with prospective economic advantage are also barred as a matter of law [because they have not shown the existence of a contract or potential contract between them and a specific third-party].

HMSA also sought a protective order against the physician-plaintiffs' discovery efforts, arguing that much of the discovery requests are irrelevant to the physician-plaintiffs' individual situations and, particularly, irrelevant to its motion to compel arbitration and motion for judgment on the pleadings. HMSA maintained that the protective order "is necessary to protect HMSA's right to an arbitral forum[ ] and to protect HMSA from undue burden, expense, annoyance and oppression."

On February 4, 2003, the physician-plaintiffs filed their opposition to HMSA's motion to compel arbitration. They maintained that (1) the arbitration clause is unconscionable because HMSA forced the physicians to accept the arbitration clause on a "take it or leave it" basis, without providing a real choice or any opportunity to negotiate the terms and (2) their claims do not fall within the scope of the arbitration clause.

On the next day, February 5, 2003, the physician-plaintiffs filed their opposition to HMSA's motion for judgment on the pleadings. Therein, they maintained, *inter alia,* that they have stated a claim: (1) under HRS chapter 480 by alleging that HMSA has engaged in a number of systemic unfair and deceptive acts and practices; (2) of tortious interference with prospective economic advantage by alleging that HMSA's conduct

was intentional and malicious and that such conduct has disrupted their relationship with their patients in a manner that has imposed financial hardships upon them; and (3) of unjust enrichment as an alternative claim for relief should the court find the PAR Agreement invalid and unenforceable.

On the same day, the physician-plaintiffs filed an expedited motion to compel discovery in response to HMSA's failure to answer their discovery requests and moved to have their discovery motion heard before the motion to compel arbitration. Specifically, the physician-plaintiffs asserted that the discovery requests were "narrowly-tailored and necessary to demonstrate that the [a]rbitration [c]lause at issue is an unenforceable contract of adhesion." Both of these motions were summarily denied.

On April 10, 2003, the circuit court heard oral argument on the parties' remaining motions (in conjunction with HMSA's motion for judgment on the pleadings in the HMA Appeal). As previously stated, the circuit court took the motions under advisement and, ultimately, entered its order on May 23, 2003, granting HMSA's motions to compel, for entry of protective order, and for judgment on the pleadings, over the physician-plaintiffs' objection. Therein, the circuit court: (1) denied the physician-plaintiffs' discovery requests and granted HMSA's protective order inasmuch as it deemed the requests to be irrelevant, overbroad, and burdensome; (2) found that (a) the arbitration clause was valid and enforceable, (b) physician-plaintiffs' claims of unconscionability did not provide a legal basis for invalidation, and (c) the physician-plaintiffs "are required to resolve their disputes outside of [c]ourt, first by administrative appeal and then by binding arbitration," as required by the dispute resolution provision; and (3) granted HMSA's motion to compel arbitration, stating that,

any claims which survive HMSA's Motion for Judgment [on the Pleadings] and for which [the physician-p]laintiffs timely filed and exhausted their administrative appeal, and thereafter timely filed a demand for arbitration, shall be resolved by individual binding arbitration, not litigation, in accord with the terms of Article VIII of the PAR

Agreements. Consolidation or class action of parties in arbitration shall not be permitted[.]

Although the court indicated that "all further proceedings in this action are hereby stayed," it dismissed the physician-plaintiffs' claims for failure to comply with the required dispute resolution procedures and granted HMSA's motion for judgment on the pleadings.[11] With respect to its grant of judgment on the pleadings, the circuit court specifically determined that the physician-plaintiffs (1) had failed to comply with the requisite non-judicial remedies in the dispute resolution provision, (2) did not have a claim of unfair methods of competition based on HSMA's alleged wrongful conduct prior to June 28, 2002 (the date on which HRS § 480-2 was amended to permit a private right of action) and, as to any alleged wrongful conduct after June 28, 2002, the physician-plaintiffs' claims did not involve claims of "competition,"[12] and (3) had not stated a claim of tortious interference with prospective economic advantage inasmuch as they identified no contract, potential contract, or third party.[13]

A separate final judgment in favor of HSMA was entered on June 6, 2003 in the Cooper Appeal case. The physician-plaintiffs timely filed their notice of appeal on June 26, 2003.

## II. STANDARDS OF REVIEW

### A. Jurisdiction: Standing

■ Whether the circuit court has jurisdiction to hear the plaintiffs' complaint presents a question of law, reviewable de

novo. A plaintiff without standing is not entitled to invoke a court's jurisdiction. Thus, the issue of standing is reviewed de novo on appeal.

*Mottl v. Miyahira,* 95 Hawai'i 381, 388, 23 P.3d 716, 723 (2001) (citations omitted).

### B. Motion to Compel Arbitration

■ A [circuit] court's order granting a motion to compel arbitration and to stay proceedings pending arbitration is reviewed de novo. The [circuit] court's decision is reviewed using the same standard employed by the [circuit] court and based upon the same evidentiary materials as were before it in determination of the motion.

*Fireman's Fund Ins. Co. v. AIG Hawai'i Ins. Co.,* 109 Hawai'i 343, 348, 126 P.3d 386, 391 (2006) (citation and internal quotation marks omitted).

### C. Motion for Judgment on the Pleadings

■ An HRCP Rule 12(c) (2004)[14] motion serves much the same purpose as an HRCP Rule 12(b)(6) (2004) motion, *i.e.*, motion to dismiss for "failure to state a claim upon which relief can be granted," except that it is made after the pleadings are closed. *Baehr v. Lewin,* 74 Haw. 530, 545–46, 852 P.2d 44, 52, *reconsideration granted in part and denied in part,* 74 Haw. 650, 875 P.2d 225 (1993) (citation omitted). "A Rule 12(c) motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted in the pleadings and only questions of law remain." *Id.* at 546, 852

---

11. Similar to the May 23, 2003 order in the HMA Appeal, this order (also filed on May 23, 2003) indicated that the circuit court granted "HMSA's request to take judicial notice of all records and files [in the HMA Appeal case]."

12. The circuit court's order in the Cooper Appeal also contained a statement identical to the one found in the HMA Appeal's May 23, 2003 order, that is:

[Physician-p]laintiffs do not have standing to assert claims arising under HRS chapter 480 for "unfair or deceptive acts or practices," because they are not consumers or other proper parties to bring suit claims. [Physician-p]laintiffs have conceded in their legal memorandum that they do not seek to assert claims

[of] "unfair or deceptive acts or practices" under HRS § 480-2.

(Brackets in original omitted.) Again, like HMA, the physician-plaintiffs do not dispute the circuit court's conclusion. In fact, their opening and reply briefs only raise arguments with respect to unfair methods of competition.

13. The circuit court also dismissed the physician-plaintiffs' claim of unjust enrichment, which is not a subject in the Cooper Appeal as the court's ruling is not challenged here.

14. HRCP Rule 12(c) provides in relevant part that, "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings."

P.2d at 52 (citation, internal quotation marks, and ellipsis omitted).

In a motion for judgment on the pleadings under HRCP Rule 12(c), the movant [must] clearly establish[ ] that no material issue of fact remains to be resolved and that he [or she] is entitled to judgment as a matter of law. In considering a motion for judgment on the pleadings, the [circuit] court is required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.

*Ruf v. Honolulu Police Dep't*, 89 Hawai'i 315, 319, 972 P.2d 1081, 1085 (1999) (brackets in original) (citations and internal quotation marks omitted). On appeal, this court reviews *de novo* the circuit court's order granting the motion. *Id.* (citation omitted).

Ultimately, our task on appeal is to determine whether the circuit court's order ... supports its conclusion that [the defendant] is entitled to judgment as a matter of law and, by implication, that it appears beyond [a] doubt that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief under any alternative theory.

*Baehr*, 74 Haw. at 550, 852 P.2d at 54 (citations omitted).

## III. *DISCUSSION*

As previously stated, the issues before this court as they relate to the HMA Appeal are whether the circuit court properly concluded that: (1) HMA lacked standing to bring an action (a) on behalf of its physician members because those physicians were contractually obligated to comply with the terms of the dispute resolution provision, including the arbitration clause, in resolving any dispute arising out of the PAR Agreement and (b) on its own behalf because HMA failed to plead a direct, cognizable injury resulting from HMSA's alleged misconduct; and (2) HMA failed to state claims of unfair methods of competition and tortious interference with prospective economic advantage. The issues presented in the Cooper Appeal involve whether the circuit court erred in concluding that: (1) the physician-plaintiffs were contractually obligated to comply with the terms

of the dispute resolution provision, including the arbitration clause, such that their claims in court are barred; (2) discovery requests are overly broad and burdensome; and (3) the physician-plaintiffs failed to state claims of unfair methods of competition and tortious interference with prospective economic advantage.

Based on the foregoing, the issues common to both appeals concern (1) the interpretation of the dispute resolution provision, including the arbitration clause, and (2) the claims of unfair methods of competition and tortious interference with prospective economic advantage. We, therefore, first examine the dispute resolution provision and, in particular, the arbitration clause.

### A. *The Dispute Resolution Provision and the Arbitration Clause*

■ We are mindful of the guiding principle that, "when presented with a motion to compel arbitration, the court is limited to answering two questions: 1) whether an arbitration agreement exists between the parties; and 2) if so, whether the subject matter of the dispute is arbitrable under such agreement." *Ko'olau Radiology, Inc. v. Queen's Med. Ctr.*, 73 Haw. 433, 445, 834 P.2d 1294, 1300 (1992); *see also Luke v. Gentry Realty, Ltd.*, 105 Hawai'i 241, 247, 96 P.3d 261, 267 (2004) ("Even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate." (Citation and internal quotation marks omitted.)).

### 1. Existence of An Agreement Between the Parties

On appeal, the physician-plaintiffs do not seriously dispute the existence of the arbitration clause in the PAR Agreements; nor does HMA dispute that its physician members entered into the PAR Agreements, which contained the arbitration clause, with HMSA. Rather, the physician-plaintiffs and HMA [hereinafter, collectively, the plaintiffs] argue that: (1) the arbitration clause contained in Article VIII is inapplicable to the claims asserted in their complaints; and (2) the arbitration clause is unenforceable based upon the doctrine of unconscionability. We,

therefore, next address the second prong of *Koolau Radiology, Inc.*, *i.e.*, whether the claims asserted by the parties fall within the scope of the arbitration clause.

## 2. The Arbitrability of the Claims

▋ "Although the public policy underlying Hawai'i law strongly favors arbitration over litigation, the mere existence of an arbitration agreement does not mean that the parties must submit to an arbitrator disputes which are outside the scope of the arbitration agreement." *Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawai'i 226, 244, 921 P.2d 146, 164 (1996) (citation and internal quotation marks omitted). "What issues, if any, are beyond the scope of a contractual agreement to arbitrate depends on the *wording of the contractual agreement to arbitrate*." *Rainbow Chevrolet, Inc. v. Asahi Jyuken (USA), Inc.*, 78 Hawai'i 107, 113, 890 P.2d 694, 700 (App. 1995), *superseded by statute as stated in, Ueoka v. Szymanski*, 107 Hawai'i 386, 114 P.3d 892 (2005) (emphasis added).

Essentially, the plaintiffs argue that the claims asserted in their complaints fall outside the scope of the arbitration clause:

> [A]rbitration is the second step in a two-step process that begins with an administrative appeal of *an HMSA "decision."* Thus, what is intended to be appealed administratively and then arbitrated are specific "decisions," *not broad grievances relating to the institution-wide policies and practices that control those decisions.* Consequently, [the plaintiffs'] claims are not governed by the PAR Agreement dispute resolution procedures.

(Emphases added.) HMSA disagrees, contending that the dispute resolution procedures, including the arbitration clause, applies to the plaintiffs' claims for relief. Specifically, HMSA directs this court to the first paragraph of section 8.3 of Article VIII of the PAR Agreement, which states that the arbitration clause covers "any and all claims, disputes or causes of action arising out of . . . or in any way related to this Agreement or its performance."

As previously stated, the first paragraph of section 8.3 states:

8.3 Arbitration Upon Exhaustion of Administrative Appeal. **HMSA and Participating Physician agree that,** except for disputes related to HMSA's Schedule of Maximum Allowable Charges, **any and all claims, disputes, or causes of action arising out of this Agreement or its performance, or in any way related to this Agreement or its performance, including but not limited to any and all claims, disputes, or causes of action based upon contract, tort, statutory law, or actions in equity,** shall be resolved by binding arbitration **as set forth in this Agreement.**

(Underscored emphasis in original.) (Bold emphases added.)

▋ At first glance, the above-language, standing alone, appears to mandate binding arbitration of *all* disputes arising out of the Agreement or its performance. However, a contract "should be construed as a whole and its meaning determined from the entire context and not from any particular word, phrase, or clause." *Hawaiian Isles Enters., Inc. v. City & County of Honolulu*, 76 Hawai'i 487, 491, 879 P.2d 1070, 1074 (1994) (citation and internal quotation marks omitted). First, section 8.3 is entitled "Arbitration *Upon Exhaustion of Administrative Appeal,*" and the first paragraph states that any disputes "shall be resolved by binding arbitration *as set forth in this Agreement.*" (Emphases added.) Second, the second and third paragraphs of section 8.3 provide that:

> Within 30 calendar days *following Participating Physician's exhaustion of administrative remedies described in Sections 8.1 and 8.2 above, Participating Physician shall submit a written request for arbitration* to Legal Services at HMSA in Honolulu, Hawai'i. . . .

> The arbitration *shall be conducted by a single arbitrator* . . . . *Fees and costs of the arbitrator and the arbitration service may be awarded by the arbitrator* as the arbitrator determines is appropriate. *If no award is made,* fees and costs of the arbitrator and the arbitration service *shall be shared equally by both parties.* The decision of the arbitrator shall be final and binding on both parties.

(Emphases added.) By their plain terms, the above two paragraphs "set forth" the requirements that: (1) the arbitration procedure is triggered only after exhaustion of the administrative remedies prescribed in sections 8.1 and 8.2; and (2) the fees and costs of the arbitration proceeding may be awarded by the arbitrator or be shared equally by the parties. Consequently, to trigger the arbitration clause of section 8.3, the claim or dispute must have completed the administrative appeal process set forth in sections 8.1 and 8.2 of the Agreement.

As previously quoted, section 8.1(a)[15] states in relevant part:

8.1 Administrative Appeal

(a) Dispute Other Than Termination (Section 7.2) or Immediate Termination (Section 7.3) of This Agreement. **If Participating Physician disagrees with a decision by HMSA, Participating Physician shall submit a written request for review by an HMSA review committee** composed of practicing physicians within one year of Participating Physician's receipt of notice of such decision. The review committee shall convene within 60 calendar days of HMSA's receipt of the request for review. Participating Physician and one other witness who is also a physician may appear to present evidence or testimony before a review committee. Participating Physician will be notified of the review committee's decision within 10 working days following the hearing.

(Underscored emphases in original.) (Bold emphasis added.)

HMSA points out that "the PAR Agreement['s] arbitration clause refers to only two parties in any arbitration: HMSA and a 'Participating Physician' (singular, not plural), and repeatedly notes the proceeding only involves these two parties, with provisions applicable to 'both' parties (*i.e.*, the two named parties)[.]" (Parentheticals in original.) In other words, section 8.1(a) requires *an individual participating physician* to submit disputes (other than those related to termination) to an HMSA review committee when the *individual* physician disagrees with *a decision by HMSA*.[16]

Accordingly, when viewing (1) section 8.3's specific title, "Arbitration Upon Exhaustion of Administrative Appeal," and (2) its specific reference to the administrative remedies prescribed in section 8.1 within the context of the entire dispute resolution provision, we agree with HMSA and conclude that the arbitration clause in Article VIII contemplates binding arbitration between a single participating physician and HMSA over a dispute that arises from a decision of HMSA. Stated differently, Article VIII requires that "all claims, disputes, or causes of action," arising from *a decision* of HMSA regarding the PAR Agreement or its performance shall first be administratively appealed by *an individual physician* pursuant to section 8.1 and, thereafter, adjudicated via binding arbitration, pursuant to section 8.3. Consequently, we next examine whether sections 8.1(a) and 8.3 apply to the plaintiffs, who bring their claims as a collective group, and whether the claims they assert fall within the scope of the arbitration agreement.

As previously stated, the plaintiffs' complaints essentially contain two counts, alleging: (1) HMSA's engagement in a scheme to delay and impede lawful reimbursement to the physician-plaintiffs, as well as other participating physicians who are HMA members, in violation of HRS chapter 480; and (2) HMSA's tortious interference with prospective economic advantage.[17] The plain-

---

15. We note that section 8.1(b), quoted *supra*, deals with "Termination of This Agreement," and section 8.2, quoted *supra*, deals with "Expedited Benefits Redetermination," which are inapplicable here.

16. Disputes triggering the administrative review process that are specifically referred to in the PAR Agreement include adverse decisions by HMSA regarding services related to: (1) HMSA's utilization management program, *e.g.*, pre-certification of a proposed service and concurrent, retrospective, and focused review of treatment protocols or specific procedures (section 2.9); (2) payment qualifiers and payment determination requirements (sections 4.2 & 4.3); and (3) expedited redetermination of any HMSA decision to deny payment for services not yet rendered (section 8.2).

17. Both complaints also contained a separate count for injunctive and declaratory relief. Further, as previously indicated, the physician-plain-

tiffs, *collectively*, claim that HMSA has engaged in unfair methods of competition based upon HMSA's conduct involving numerous systemic, unfair and deceptive acts and practices. Thus, having asserted their claims collectively, as opposed to individually, the plaintiffs—as a group—are not subject to the requirements of section 8.1(a). Indeed, as the plaintiffs argue—and we agree—

> the necessary system-wide relief could never be granted in an individual proceeding where the specific issue being addressed is one isolated decision or a series of decisions relating to one physician.... [T]he Agreement's administrative remedies by design are not adequate to provide relief for the types of claims alleged here. [The plaintiffs] have **no** means for placing evidence of broad-based, systemic wrongs before an internal review panel, whether by aggregating the claims of multiple physicians, permitting extensive discovery of HMSA or allowing testimonial evidence of more than merely two persons. All such avenues are foreclosed under the terms of the PAR Agreement['s] administrative appeal procedures.

(Bold emphasis in original.) Accordingly, we conclude that the plaintiffs' claims of unfair methods of competition are not claims for which the dispute resolution provision, including the arbitration clause, was contemplated.[18] It, therefore, follows that the plaintiffs' claims of tortious interference with prospective economic advantage—involving the plaintiffs' collective assertion that HMSA's alleged intentional and malicious unfair and deceptive acts and oppressive business practices were designed to delay, deny, and reduce lawful reimbursement, thereby disrupting and impeding their relationships with their patients—are, likewise, not claims contemplated by the PAR's dispute resolution procedures. Consequently,

---

tiffs are not appealing the dismissal of their unjust enrichment claim.

**18.** In light of our conclusion that the plaintiffs' claims do not fall within the arbitration clause, we need not address the plaintiffs' remaining argument that their claims fall within section 8.4 (stating that "Participating Physician's right to arbitration does not include the right to contest any charge included in HMSA's Schedule of

we hold that the circuit court erred in compelling arbitration.

Preliminarily, however, before addressing whether the plaintiffs can maintain their claims for violation of HRS chapter 480 and tortious interference with prospective economic advantage in the circuit court, we must examine whether HMA has standing to bring the present action (1) on behalf of its physician members and (2) on its own behalf.

### B. *Jurisdiction: HMA's Standing*

 "This court has long acknowledged that standing is that aspect of justiciability focusing on the party seeking a forum rather than on the issue he or she wants adjudicated." *Sierra Club v. Hawai‘i Tourism Auth.*, 100 Hawai‘i 242, 271, 59 P.3d 877, 906 (2002) (brackets, citation, and internal quotation marks omitted); *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."). It is well-settled that courts must determine as a threshold matter whether they have jurisdiction to decide the issues presented. *Pub. Access Shoreline Hawai‘i v. Hawai‘i County Planning Comm'n*, 79 Hawai‘i 425, 431, 903 P.2d 1246, 1252 (1995). If a party is found to lack standing, the court is without subject matter jurisdiction to determine the action. *See Pele Defense Fund v. Puna Geothermal Venture*, 77 Hawai‘i 64, 67, 881 P.2d 1210, 1213 (1994). Thus, "[i]f a court lacks jurisdiction over the subject matter of a proceeding, any judgment rendered in that proceeding is invalid." *Bush v. Hawaiian Homes Comm'n*, 76 Hawai‘i 128, 133, 870 P.2d 1272, 1277 (1994).

 "In determining whether [the plaintiff] has standing, we look solely to whether [the plaintiff] is the proper plaintiff

---

Maximum Allowable Charges or the fee review process"), quoted *supra*. Moreover, we note that our holding today also renders moot the physician-plaintiffs' contention that the circuit court erred in denying their request for discovery to determine the enforceability of the arbitration clause. Lastly, the disposition of this case negates the need to discuss the issue of unconscionability.

in this case, without regard to the merits of the allegations [in the complaint]." *Hawai'i Thousand Friends v. Anderson,* 70 Haw. 276, 281, 768 P.2d 1293, 1298 (1989). Further, although lack of standing is raised by the defendant, the plaintiff bears the burden of establishing that he or she has standing. *Sierra Club,* 100 Hawai'i at 250, 59 P.3d at 885.

On appeal, HMSA contends that HMA lacks standing because: (1) HMA has no derivative standing to sue on behalf of its members inasmuch as (a) the physician members could not bring the claims individually in court in light of the mandatory arbitration clause in the Agreements and (b) the requested relief cannot be achieved demonstrably independent of securing the participation of its members in the lawsuit; and (2) there is insufficient "injury-in-fact" to have standing on its own behalf. We, therefore, address the threshold matter whether HMA has standing to bring the instant action, first, on behalf of its physician members and, second, on its own behalf.

## 1. HMA's Standing to Sue on Behalf of its Physician Members

 An association may sue on behalf of its members—even though it has not itself been injured—when:

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Sierra Club,* 100 Hawai'i at 271 n. 1, 59 P.3d at 906 n. 1 (Moon, C.J., dissenting) (acknowledging *Hunt's* three-part test for organizational standing). "Each of the three *Hunt* requirements must be met by a litigant asserting [organizational] standing." *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1286 (9th Cir.1992) (citation and internal quotation marks omitted).

In this case, HMSA effectively concedes the existence of the second element, *i.e.,* that the interest HMA seeks to protect is ger-

mane to HMA's organizational purpose, inasmuch as HMSA presents no argument to the contrary. However, echoing HMSA's position, the circuit court found, *inter alia,* that HMA's claims (1) are barred because they must pursue administrative remedies and, then, binding arbitration and (2) would require a level of individual participation that precludes organizational standing. On appeal, HMSA reiterates its position that HMA fails to meet the first and third elements of the *Hunt* requirements, asserting that:

[HMA] fails the first part because [HMA's] members cannot sue on their own right. This fact is alone dispositive of [HMA's] lack of standing. After exhausting their administrative remedies, [HMA's] members are required to arbitrate any remaining claims against HMSA.

. . . .

[HMA] fails the third prong of the *Hunt* test because the claims [HMA] asserts will require extensive participation by its individual members. [HMA] claims it is challenging HMSA's "systemic" practices, but its complaint can only be validated on an **individualized** basis.

(Emphasis in original.)

### a. *physician members' standing to sue in their own right*

In opposition to HMSA's contention that the first prong of the *Hunt* test is not satisfied because HMA's members are required to first exhaust their administrative remedies and then arbitrate their claims, HMA challenges the enforceability of the arbitration clause and the scope of arbitration, asserting that the claims fall outside the arbitration clause. HMA additionally argues that:

Standing is a prerequisite to claim adjudication, regardless of what forum is used to adjudicate the claim. In other words, if [HMA] did not have standing, it could not bring a claim in any forum.

HMA's ability to pursue representative claims on behalf of its members is determined by reference to the standing of its members to bring a claim. *Hunt,* 432 U.S. at 343[, 97 S.Ct. 2434]. And the members' standing, in turn, depends on whether they

have a sufficient stake in the controversy, which they clearly do[.] Whether they are required to exhaust administrative remedies and to plead the same ... is an entirely distinct issue. The [c]ourt erred in failing to recognize this vital distinction. Consequently, its holding that the first *Hunt* test is not met here must be reversed.

Stated differently, HMA contends that:

HMSA mischaracterizes the holding in *Hunt* to suggest that an association cannot assert claims on its members' behalf in court if its members may not do so **in court.** HMSA distorts the language of the first prong of the *Hunt* test, which requires nothing more than that the individual members have an injury sufficient to pursue their claims.

(Emphasis in original.)

Inasmuch as we have concluded that the claims asserted by the plaintiffs are not within the contemplated scope of the arbitration clause, the physician-plaintiffs have standing to sue in their own right. Thus, *Hunt*'s first element is met.

### b. *participation of individual members*

At the outset, it should be noted that HMA concedes it is not seeking monetary damages, *see supra* note 6, notwithstanding the fact that its complaint specifically alleges that:

HMA is ... entitled to the relief provided in [HRS chapter 480]. In this regard, as a direct and proximate result of [HMSA's] unfair methods of competition, *HMA and HMA members have suffered and continue to suffer damages and are therefore entitled to treble damages sustained by them.* [HMA] is further entitled to equitable relief, as provided by HRS chapter 480, including an injunction. In addition, *[HMA] is entitled to recover of their reasonable attorneys' fees together with the costs sustained in prosecuting this action.*

(Emphases added.) Because claims for monetary damages would require the significant participation of individual members, such factor would fatally undercut a request for organizational standing. On this point, the United States Supreme Court has explained that:

Whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.

*Hunt*, 432 U.S. at 343, 97 S.Ct. 2434 (quoting *Warth*, 422 U.S. at 515, 95 S.Ct. 2197) (internal quotation marks and parentheses omitted). Consequently, courts have held that associations cannot generally raise claims for monetary damages on behalf of their members. *See Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 284 (3d Cir.2002); *Air Transp. Ass'n of Am. v. Reno*, 80 F.3d 477, 484–85 (D.C.Cir. 1996) (citing a collection of cases for the same proposition); *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 923 (7th Cir. 1995); *United Union of Roofers, Waterproofers, & Allied Trades No. 40 v. Ins. Corp. of Am.*, 919 F.2d 1398, 1400 (9th Cir.1990); *Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 933 (9th Cir.1987). We agree. Thus, to the extent that HMA's complaint raises claims for monetary damages on behalf of its members, we believe HMA lacks standing.

However, as previously noted, *see supra* note 6, HMA has effectively abandoned its alleged monetary damage claims on behalf of its members, indicating instead that it now seeks only declaratory and injunctive relief. Thus, based on HMA's representation, the remaining organizational standing question is whether HMA's request for declaratory and injunctive relief will require an inappropriate level of individual participation based on the allegations in the complaint, which we take as true.

Generally, "requests by an association for declaratory and injunctive relief do not re-

quire participation by individual association members." *Hosp. Council of Western Pennsylvania v. City of Pittsburgh,* 949 F.2d 83, 89 (3d Cir.1991) (citations omitted). However, the general rule is not invariable. In the instant case, HMSA contends that:

> [M]uch of [HMA's] case involves claims about "medically necessary" care, profiling "individual" physicians, requiring "excessive" documentation for claims, failing to provide sufficient staffing for inquiries or sufficient explanation for denials, which can only be evaluated by examining the facts of each patient and physician involved. [HMA] will need to prove how HMSA's wrongful conduct harms physicians individually and then ask the court to infer that HMSA's policies and practices as a whole are flawed. To show HMSA's alleged "systemic" practices, [HMA] will need to prove first that the alleged practices occurred to identifiable physicians and patients, next, show that its proof represents the norm, not some aberration, and then establish that the practices violated the relevant contracts and statutes. This cannot be accomplished without both the active participation of [HMA's] members and disclosure of evidence regarding their treatment of individual patients who are HMSA members.

HMA disagrees, arguing that:

> [T]he notion that [HMA] would be required to provide individualized evidence (including individual patients' records) regarding HMSA's improper reimbursement decision, or to show how each individual physician was harmed, ignores that the wrongs complained of in this action are the result of pervasive, systemic policies and institution-wide practices that were intentionally created and implemented for the purpose of cutting HMSA's own costs at the expense of physicians and patients **without regard to patients' health conditions, treatment setting, and other individualized factors.** An examination of the systemic practices [HMA] seeks to enjoin demonstrates that the type of individualized inquiry the [c]ircuit [c]ourt describes would not be necessary. Practices such as "downcoding," "bundling," disregard of "modifiers" and improper application of CPT codes are alleged to have been used **routinely and automatically** (in many cases, through use of automated computer software), without regard to questions of medical necessity or the circumstances attendant to the provision of individual services to patients. Thus, the proof of [HMA's] claims regarding these practices would be adduced primarily through HMSA's own witnesses and own records (which would already include documentation of claims submitted by physicians). It will not require the testimony of every affected physician.

(Emphases in original.) Relying on *Pennsylvania Psychiatric Society v. Green Spring Health Services, Inc.,* 280 F.3d 278, 284 (3d Cir.), *cert. denied,* 537 U.S. 881, 123 S.Ct. 102, 154 L.Ed.2d 138 (2002), HMA maintains that any limited participation by individual physicians would not defeat its organizational standing. In *Pennsylvania Psychiatric Society,* the United States Court of Appeals for the Third Circuit expressed doubt as to whether certain claims for declaratory and injunctive relief, brought by an association on behalf of its members, could be established without significant individual participation. *Id.* at 286. There, an association of licensed psychiatrists (the Society) brought suit against Green Spring Health Services, Inc. (Green Spring), an administrator of managed health care plans that had entered into individual contracts (the Green Spring contracts) with its member-psychiatrists to form a "provider network" of psychiatric services. *Id.* at 281–82. The Society also sued various health maintenance organizations (HMOs) that had contracted with Green Spring to provide psychiatric services to the HMOs' subscribers. *Id.* at 281. The Society sought damages, as well as declaratory and injunctive relief, on the grounds that Green Spring and the HMOs (collectively, the defendants) had unfairly profited at the expense of the Society's members by

> refus[ing] to authorize and provide reimbursement for medically necessary mental health treatment; interfer[ing] with patients' care by permitting non-psychiatrists to make psychiatric treatment decisions; violat[ing] [the Green Spring contracts] by

improperly terminating relationships with certain psychiatrists; and breach[ing] the contractual duties of good faith and fair dealing by failing to timely pay psychiatrists and by referring patients to inconvenient treatment locations, thereby depriving some patients access to treatment. *Id.* at 282.

The defendants moved to dismiss the complaint for lack of the Society's standing to sue on behalf of its members. *Id.* at 285. They argued that the medical coverage decisions on psychiatric care forming the basis for the Society's allegations were "fact-intensive inquiries" that would fail the third prong of the *Hunt* test. *Id.* The United States District Court for the Western District of Pennsylvania agreed and granted the defendants' motion. *Id.* at 286.

Although the Third Circuit, on appeal, agreed with the trial court's dismissal of the claims for damages, *id.* at 284, 286 n. 6., it reversed with respect to the Society's declaratory and injunctive claims, stating:

[*The Society] maintains [that] the heart of its complaint involves systemic policy violations that will make extensive individual participation unnecessary.* In effect, the [Society] contends the *methods* the [defendants] employ for making decisions—*e.g.,* authorizing or denying mental health services, credentialing physicians, and reimbursement—represent breaches of contract as well as tortious conduct. Therefore, *insofar as its allegations concern how the [defendants] render these decisions, the Society's complaint involves challenges to alleged practices that may be established with sample testimony, which may not involve specific, factually intensive, individual medical care determinations.*

If the Society can establish these claims with limited individual participation, it would satisfy the requirement for [organizational] standing. While we question whether the Society can accomplish this, at this stage of the proceedings on a motion to dismiss for lack of standing, we review

sufficiency of the pleadings and must accept as true all material allegations of the complaint and must construe the complaint in favor of the plaintiff. *For this reason, we believe the Society's suit should not be dismissed before it is given the opportunity to establish the alleged violations without significant individual participation[.]* *Id.* at 286 (some emphases in original and some added) (citations, internal quotation marks, and alteration marks omitted).

Moreover, in *Hospital Council of Western Pennsylvania v. City of Pittsburgh,* 949 F.2d 83 (3d Cir.1991), a case cited by the court in *Pennsylvania Psychiatric Society,* the Third Circuit explained that the third prong of the *Hunt* test was satisfied even though the participation of some of the individual members of the council might be required. *Id.* at 89. In *Hospital Council of Western Pennsylvania,* the Council [19] had filed a complaint in federal district court, alleging that the defendant-governmental-units were attempting to force tax-exempt member-hospitals to make payments in lieu of taxes by indicating that, if the hospitals did not make such payments, their tax-exempt status would be challenged or they would likely encounter difficulty with other governmental matters such as zoning approvals. The federal district court dismissed the complaint based upon, *inter alia,* its conclusion that the claims asserted and the relief requested would require the participation of the individual hospitals in the lawsuit and that, therefore, the Council had not met the third requirement of *Hunt.*

On appeal, the Third Circuit, focusing on the Supreme Court's language in *Hunt* that organizational standing is inappropriate if the claim or request for relief requires "the participation of individual members in the lawsuit," *id.* at 89 (quoting *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434) (internal quotation marks omitted), stated:

Viewed alone, this language could be interpreted to mean that [organizational] standing is not permitted if participation by any members of the association would be necessary. This language, however, appears

19. The complaint alleged that the Council is "a Pennsylvania nonprofit corporation which functions as a membership organization that represents, assists and speaks for its members in matters where joint action is appropriate." *Id.* at 85 (internal quotation marks omitted).

to paraphrase a more detailed statement first made by the [Supreme] Court in *Warth* and repeated in later cases. In *Warth* . . ., the Court wrote:

[S]o long as the nature of the claim and of the relief sought does not make the individual participation of *each injured party indispensable* to proper resolution of the cause, the association may be an appropriate representative of its members entitled to invoke the court's jurisdiction. [422 U.S. at 511, 95 S.Ct. 2197 (emphasis added).]

The Court quoted and relied upon this statement in *Hunt*, 432 U.S. at 343[, 97 S.Ct. 2434.] *Accordingly, it appears that an association may assert a claim that requires participation by some members.*

*Id.* at 89 (some emphases in original and some added). Recognizing that the Council's claims would require *some* participation by *some* Council members, the Third Circuit acknowledged that, unlike some prior organizational standing cases, the case was not challenging a statute, regulation, or ordinance, but instead involved a challenge to governmental practices. Consequently, it would probably be necessary to prove, through evidentiary submission, the manner in which the defendants treated individual member hospitals. *Id.* at 89–90. Such litigation would likely require that member-hospitals provide discovery and trial testimony by their officers and employees. Nevertheless, the Third Circuit concluded that, because such participation would not constitute participation by "each injured party" in the suit, it did not run afoul of the third prong of the *Hunt* test. *Id.* at 90 (bracketed word omitted).

We believe the approach of the Third Circuit is a sound one. Therefore, turning to the allegations in HMA's complaint, we note that HMA's prayer for relief seeks, *inter alia*,

a permanent injunctive relief prohibiting, restraining, and enjoining [HMSA] from engaging in the conduct complained of herein, including, *inter alia*:

(i) continuing to direct their internal agents to reduce or fully deny reimbursement without regard to the va-

lidity or necessity of the services provided;

(ii) continuing to bundle claims for separate procedures thereby denying HMA members all or part of the payment due for some procedures;

(iii) denying payment of modifiers for complicated medical cases that involve excessive time and resources;

(iv) continuing to downcode procedures performed by HMA members;

(v) continuing to use software that automatically downcodes healthcare services provided by HMA members;

(vi) improperly employing software programs to "profile" physicians and automatically downcode procedures and/or deny payment to those physicians identified as purportedly providing "excessive procedures" without any clinical review, oversight or justification;

. . . .

(viii) forcing physicians and their staff to expend unreasonable amounts of time and resources attempting to obtain the reimbursement to which they are entitled;

(ix) failing to provide adequate explanations for the denial of claims for reimbursement;

. . . .

(xiii) systematically reducing reimbursement rates to HMA members below reasonable levels;

(xiv) failing to properly reimburse HMA members by requiring physicians to submit excessive documentation justifying their claims submissions; and

(xv) otherwise interfering with or obstructing the right to full and timely reimbursement to HMA members.

HMA maintains that its claims are "highly amenable to proof with little or no physician participation, because they involve systemic policy violations that will make extensive individual participation unnecessary." Consistent with the argument advanced in its answering brief, HMA reiterates in its reply brief that

HMSA's adjudication of physician reimbursement claims is improper because HMSA adjudicates claims **on an automated, systemic basis,** using software that automatically imposes pre-determined "edits" upon claims, without any consultation of patient records or the actual circumstances surrounding each claim. Hence, there is no need to require a trial into the medical necessity of any medical service rendered, because [HMA] will establish the impropriety of HMSA's conduct by demonstrating that [HMSA] **automatically** reduces or denies payments **without regard to medical necessity.**

(Emphases in original.)

Inasmuch as HMA's allegations substantially focus on systemic practices and methods used to make decisions regarding reimbursement and approval of treatments, we conclude that HMA has satisfied the third *Hunt* requirement and, thus, has sustained its burden to plead organizational standing. *See Pennsylvania Psychiatric Soc'y,* 280 F.3d at 286 (finding that allegations involving systemic policy violations do not need "specific, factually intensive, individual medical care determinations"). Additionally, our conclusion that HMA's allegations are sufficient to confer organization standing is strongly supported by a similar decision in *In re Managed Care Litigation,* 298 F.Supp.2d 1259 (S.D.Fla.2003). In that case, two groups of plaintiffs—the health care providers and medical associations—commenced suit against managed care companies (the insurers), alleging that the insurers engaged in a pattern of failing to fully and timely pay claims for reimbursement for medical services in violation of federal and state statutes. *Id.* at 1271. Among other things, the United States District Court for the Southern District of Florida concluded that the medical associations had standing to bring suit on behalf of its members on the grounds that (1) the medical associations' allegations concerned "a broad-based scheme where systemic techniques are used to make decisions regarding patient care and compensation for treatment" and (2) the medical associations were not seeking damages for their members, only injunctive and declaratory relief. *Id.* at 1308.

Moreover, although some of HMA's allegations may require several physician members to testify and participate in the lawsuit, the third element of the *Hunt* test is nonetheless satisfied because the allegations of systemic denial and delay in reimbursement and HMA's request for declaratory and injunctive relief on HMSA's alleged deceptive and unfair practices do not require "individualized proof," *i.e.,* participation of *each* physician member. *See Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 603 (7th Cir.1993) ("Declaratory, injunctive, or other prospective relief will usually inure to the benefit of the members actually injured and thus individualized proof of damages is often unnecessary." (Citing *Warth,* 422 U.S. at 515, 95 S.Ct. 2197.)); *Hosp. Council of Western Pennsylvania,* 949 F.2d at 89 ("association may assert a claim that requires participation by some members" (emphasis omitted)); *Appraisers Coalition v. Appraisal Inst.,* 845 F.Supp. 592, 601 (N.D.Ill.1994) ("The third element of *Hunt* is satisfied, despite the participation of one or many members of an association, when the cause of action and relief sought does not require 'individualized proof' for the litigation of the case.").

Accordingly, we hold that HMA has, at this stage in the litigation, carried its burden of pleading standing to bring claims on behalf of its physician members. However, whether, on a going-forward basis, HMA will be able to satisfy its burden of organizational standing with the manner and degree of evidence required at successive stages of the litigation is an issue upon which this court expresses no opinion. We now turn to address the second threshold matter, *i.e.,* whether HMA has standing to sue in its individual capacity.

### 2. HMA's Standing to Sue on Behalf of Itself as an Organization

An organization also has standing to sue for injury to its own interests, separate from any injury to its members, inasmuch as standing may be established in an individual or representative capacity. *See Havens Realty Corp. v. Coleman,* 455 U.S.

363, 378–79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

It is well settled that the crucial inquiry with regard to standing is whether the plaintiff has alleged such a *personal stake in the outcome of the controversy* as to warrant his or her invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on his or her behalf. In deciding whether the plaintiff has the requisite interest in the outcome of the litigation, we employ a three-part test: (1) *has the plaintiff suffered an actual or threatened injury as a result of the defendant's wrongful conduct; (2) is the injury fairly traceable to the defendant's actions; and (3) would a favorable decision likely provide relief for plaintiff's injury.*

With respect to the first prong of this test, the plaintiff must show a distinct and palpable injury to himself or herself. The injury must be distinct and palpable, as opposed to abstract, conjectural, or merely hypothetical.

*Akinaka v. Disciplinary Bd. of Hawai'i Supreme Court,* 91 Hawai'i 51, 55, 979 P.2d 1077, 1081 (1999) (citations, internal quotation marks, and brackets omitted) (emphases added); *see also Sierra Club,* 100 Hawai'i at 250, 59 P.3d at 885; *Fujimoto v. Au,* 95 Hawai'i 116, 138–39, 19 P.3d 699, 721–22 (2001); *Mottl,* 95 Hawai'i at 389, 23 P.3d at 724.

Pointing to the allegations in its complaint, quoted below, HMA argues that it has alleged an actual and threatened injury as a result of HMSA's conduct:

62. HMSA's unfair and deceptive course of conduct, oppressive business practices and unfair methods of competition have injured HMA in its own right as HMA's efforts to achieve its purposes have been, and continue to be, frustrated by [HMSA's] practices, and HMA has been required to devote significant resources to dealing with issues concerning [HMSA's] improper unfair and deceptive practices[;]

63. [HMSA's] unfair and deceptive course of conduct, oppressive business practices and unfair methods of competition have forced HMA to devote significant resources to handling physician practices inquiries, counseling physicians and otherwise helping to identify and counteract the harm caused by [HMSA] set forth in the [c]omplaint. Specifically, HMA devotes the time of several of its employees to deal with the practices at issue herein. HMA's efforts to counteract [HMSA's] unfair and deceptive practices include, *inter alia,* counseling HMA members on how to counteract the practices at issue, monitoring [HMSA's] practices, advocating on HMA's member's behalf, and lobbying for insurance reform.

In support of its position, HMA cites to the United States Supreme Court's decision in *Havens Realty Corp.* for the proposition that the allegation that an association has devoted significant resources to counteract the effect of the defendant's wrongful practices are sufficient to confer standing in its own right. In *Havens Realty Corp.,* the defendants' discriminatory actions involved steering potential black tenants away from the defendants' apartment buildings. 455 U.S. at 367, 102 S.Ct. 1114. The plaintiff-organization, which operated a housing counseling service, brought suit against the defendants for engaging in racial steering practices, in violation of section 804 of the Fair Housing Act of 1968, 42 U.S.C. § 3604. *Id.* at 366–67, 102 S.Ct. 1114. The plaintiff-organization's complaint alleged that:

[Plaintiff] has been *frustrated* by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. [Plaintiff] *has had to devote significant resources to identify and counteract* the defendant[s'] racially discriminatory steering practices.

*Id.* at 379, 102 S.Ct. 1114 (internal quotation marks, citation, and brackets omitted) (emphases added). In an appeal to the United States Court of Appeals for the Fourth Circuit from the federal district court's grant of the defendants' motion to dismiss for lack of standing, the Fourth Circuit reversed, holding that the plaintiff's allegation of injury was sufficient, at the pleading stage, to satisfy the standing requirements. *Id.* at 369–70, 102 S.Ct. 1114.

The Supreme Court affirmed, holding that the plaintiff's allegations of injury, causation, and redressability was sufficient to establish organizational standing, and stated:

> If, as broadly alleged, [the defendants'] steering practices have perceptibly impaired [the plaintiff's] ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. *Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.* We therefore conclude, as did the Court of Appeals, that in view of [the plaintiff's] allegations of injury it was improper for the District Court to dismiss for lack of standing the claims of the organization in its own right.

*Id.* at 379, 102 S.Ct. 1114 (citation and footnotes omitted) (emphasis added).

Relying on *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 768 P.2d 1293 (1989), HMSA maintains that HMA's allegation is not legally sufficient to confer standing because it is merely "investigative expenditures." *Id.* at 284, 768 P.2d at 1299. In *Hawaii's Thousand Friends,* then-Mayor Frank Fasi directed his administration to embark on a study of available locations in central Oʻahu for a city-developed housing project, pursuant to authority granted by the legislature in HRS §§ 359G–4.1 and 46–15.1. 70 Haw. at 278, 768 P.2d at 1296. The Waiola Estate lands was identified as ideal for the proposed housing development. *Id.* Hawaiʻi Thousand Friends (the plaintiff), a non-profit corporation, learned of the proposed development through a series of public advertisements that touted the then-City and County of Honolulu Managing Director's efforts in the project. *Id.* at 279, 768 P.2d at 1296. Thereafter, the plaintiff began an investigation into the Waiola project, concerned that the proposed project was to be situated on land that was designated as agricultural in the State Development Plan. *Id.* at 279, 768 P.2d at 1297.

The plaintiff filed suit, and the State defendants unsuccessfully moved for partial summary judgment based on the plaintiff's lack of standing. *Id.* at 280, 768 P.2d at 1297. Eventually, the case went to trial on the plaintiff's third amended complaint, wherein it alleged, *inter alia,* that the State defendants had: (1) conspired to place public ads for the Waiola project solely to promote then-City Managing Director's political goals, thereby committing a fraudulent use of public funds; and (2) made numerous misrepresentations in the advertisements.

According to the complaint, the injury sustained by [the plaintiff] was the "unlawful depletion of the City and County of Honolulu cash assets held in public trust." It prayed for relief in the form of . . . (2) an injunction barring [the State] defendants from taking any further action on the Waiola project; and (3) general damages to be paid directly to the City treasury in the amount of the public funds used to finance the Waiola project.

*Id.* The jury returned a verdict in favor of the plaintiff in the amount of $482,921. The plaintiff, thereafter, requested that the judgment reflect that the award be paid to the City's treasury rather than to the plaintiff. The trial court declined, stating that it had no authority to amend the jury's verdict. *Id.* at 281, 768 P.2d at 1297.

On appeal to this court, the State defendants raised, *inter alia,* the issue of the plaintiff's standing. This court held that the plaintiff did not have standing to bring suit, explaining that:

> [The plaintiff] allege[d] that it suffered three types of injury as a result of defendants' actions. First, because of the illegal use of public moneys, those moneys are not available for environmental studies and/or other low-and moderate-income housing developments. This asserted injury can be viewed in two ways, neither of which would give [the plaintiff] standing: (a) it could be interpreted to mean that in order to conduct environmental studies and other housing developments, additional funds would have to be found to pay for them; and (b) that [the plaintiff's] political priorities—environmental studies and oth-

er housing developments funded through governmental expenditures—would not be addressed. By such an assertion, [the plaintiff] is seeking to do no more than vindicate its own value preferences[, the proper forum for which is in the legislature, executive, or administrative agencies,] through the judicial process [*i.e.*, the plaintiff failed to show some concrete injury].

*Id.* at 283, 768 P.2d at 1299 (brackets, citation, and internal quotation marks omitted). This court further noted that the plaintiff's claim that "it was compelled to investigate defendants' illegal conduct, and in doing so expended its own funds, is also a use of the judicial process to vindicate [the plaintiff's] value preferences." *Id.* at 284, 768 P.2d at 1299.

Were we to recognize [the plaintiff's] *investigation expenditures* as injury in fact sufficient to confer standing, any interest group or individual could initiate special interest litigation merely by incurring expenses connected therewith. We abhor the use of courtrooms as political forums to vindicate individual value preferences.

*Id.* (emphasis added).

The allegations of the case before this court, however, are distinguishable from those advanced in *Hawaii's Thousand Friends* inasmuch as HMA is not alleging that the diversion of its resources was devoted to the lawsuit at issue. Indeed, as this court stated in *Hawaii's Thousand Friends,* an organization's allegation that it expected to expend or had expended resources by filing a lawsuit to challenge the defendant's practice or policy are insufficient to establish standing. *Id.* at 284, 768 P.2d at 1299. We note that the United States Courts of Appeals for the District of Columbia, the Third Circuit, and the Fifth Circuit have also held that, for an organization to show the requisite injury, it must demonstrate an expenditure of resources independent of those connected with its lawsuit. *See Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers,* 141 F.3d 71, 79 (3d Cir.1998) (holding that "litigation expenses alone do not constitute damage sufficient to support standing"); *Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.,* 28 F.3d 1268, 1276 (D.C.Cir.1994) (finding that expense of testing was a "self-inflicted" harm resulting from organization's budgetary choices rather than defendant's actions); *Ass'n for Retarded Citizens v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trs.,* 19 F.3d 241, 244 (5th Cir.1994) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization."); *Spann v. Colonial Village, Inc.,* 899 F.2d 24, 27 (D.C.Cir.), *certs. denied,* 498 U.S. 980, 111 S.Ct. 508, 509, 112 L.Ed.2d 521 (1990) ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation."); *but cf. Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 905 (2d Cir.1993) (organization had standing to sue based on diversion of resources to pursue litigation and other legal efforts to counteract the discrimination); *Hooker v. Weathers,* 990 F.2d 913, 915 (6th Cir.1993) (organization had standing based on investigation using testers and confirmation of facts and circumstances alleged in complaint); *Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1525 (7th Cir.1990) (to have standing the organization need only show deflection of time and money from counseling to legal efforts).

As previously stated, HMA alleges that HMSA's conduct has frustrated HMA's pursuit of its underlying purpose,[20] because

20. HMA set forth its organizational purpose in its complaint as follows:

The philosophy and purpose of HMA is to: (1) serve physicians, their patients, and the community through representation, advocacy, and other services directed at providing quality medical care; (2) promote the science and art of medicine and strive to improve public health; (3) participate in the development of health policy for Hawai'i; (4) provide information related to medicine; (5) establish and maintain standards of professional conduct and performance; (6) participate in evaluation and maintenance of standards for medical edu-

HMSA's alleged wrongful practices have threatened its members' ability, *inter alia*, to provide medically necessary healthcare services and fulfill other aspects of their patients' care. Thus, HMA alleges that it has been required to devote significant resources to dealing with issues concerning HMSA's wrongful practices. In our view, HMA's allegations are more akin to those alleged in *Havens Realty Corp.*, 455 U.S. at 379, 102 S.Ct. 1114, as discussed *supra* (association had standing when the defendants' conduct caused more than a setback to its abstract social interests, such as injury to its counseling activities and a drain in its resources). Further, as the court in *In re Managed Care Litigation*, 298 F.Supp.2d at 1306, stated, "allegations that the [insurers] have interfered in medical treatment decisions and developed systemic practices regarding payments directly affect medical associations who must deal with the fallout of such behavior." In that case, the federal district court, rejecting the insurers' contention that the complaint lacked an objectively quantifiable, concrete set of costs, other than the cost of litigation, concluded that the medical associations had sufficiently alleged the elements of individual standing by asserting, *inter alia*, in their complaint that, "the systemic practices being challenged in this lawsuit have caused them to lose membership and to expend their own time and resources fighting [the insurers'] tactics." *Id.* at 1305. Accordingly, we hold that, at this stage in the litigation, HMA has sufficiently alleged direct injury to itself and, thereby, possesses standing to bring suit on its own behalf as an organization to address that injury. *See also Moseke v. Miller & Smith, Inc.*, 202 F.Supp.2d 492, 499–500 (E.D.Va.2002) (finding that an association has alleged facts that demonstrate a palpable injury to itself by alleging that it "devoted significant resources to identify and counteract the [d]efendants' practices" and did so to the detriment of its

organizational purpose (citation and internal quotation marks omitted)).

Having concluded that the plaintiffs are entitled to bring their claims in court, we next turn our discussion to the circuit court's orders granting HMSA's motion for judgment on the pleadings, essentially dismissing the plaintiffs' claims of unfair methods of competition and tortious interference with prospective economic advantage based upon a failure to state a claim.

### C. *Motion for Judgment on the Pleadings*

In challenging the circuit court's dismissal of their claims of unfair methods of competition and tortious interference with prospective economic advantage, the plaintiffs argue that the circuit court erroneously concluded that: (1) their pre-June 28, 2002 claims of unfair competition are barred inasmuch as a private right of action for unfair methods of competition did not exist until the 2002 amendment to HRS § 480–2; (2) their post-June 28, 2002 claims were still barred because the plaintiffs were not "competitors" of, nor in "competition" with, HMSA to sustain claims of unfair methods of competition; and (3) the plaintiffs failed to allege the existence of a contract or that a potential contract existed between them and a specific third-party to support their claims of tortious interference with prospective economic advantage.

#### 1. Unfair Methods of Competition

HRS § 480–2 (1993) provided in relevant part:

§ 480–2 **Unfair competition, practices, declared unlawful.** (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

(b) In construing this section, the courts and the office of consumer protection shall give due consideration to the rules, regula-

---

cation; (7) preserve high quality of care standards; and (8) assist physicians in responding to the changing medical practice environment.

HMA is also dedicated to providing a voice for physicians, regardless of medical specialty, at the State Legislature and serving the interest of Hawai'i physicians and supporting their ef-

forts to provide high quality medical care for all citizens of the State. HMA serves as a resource for its members and assists them in addressing the many issues and needs which they face in providing healthcare to their patients.

tions, and decisions of the Federal Trade Commission [ (FTC) ] and the federal courts interpreting section 5(a)(1) of the Federal Trade Commission Act [ (FTCA) ] (15 U.S.C. [§ ]45(a)(1)), as from time to time amended.

(c) No showing that the proceeding or suit would be in the public interest (as these terms are interpreted under section 5(b) of the [FTCA] ) is necessary in any action brought under this section.

(d) No person other than a consumer, [21] the attorney general or the director of the office of consumer protection <u>may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section.</u>

(Bold emphasis in original.) (Underscored emphases added.) Moreover, HRS § 480–13(a) (Supp.2005) states in relevant part:

§ 480–13 **Suits by persons injured; amount of recovery, injunctions.** (a) Except as provided in subsections (b) and (c), any person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by this chapter:

(1) May sue for damages sustained by the person, and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorney's fees together with the costs of suit[; and]

(2) May bring proceedings to enjoin the unlawful practices, and if the decree is for the plaintiff, the plaintiff shall be awarded reasonable attorney's fees together with the costs of suit.

(Bold emphasis in original.)

a. *pre–June 28, 2002 unfair methods of competition claims*

On July 15, 1999, this court decided *Robert's Hawai'i School Bus, Inc. v. Laupahoehoe Transportation Co.*, 91 Hawai'i 224, 982 P.2d 853 (1999), essentially holding that there was no private claim for relief under HRS § 480–13 for unfair methods of competition in violation of HRS § 480–2.[22] *Id.* at 252, 982 P.2d at 881. In so holding, this court examined both HRS §§ 480–2 and –13 and the legislative history, particularly the 1965 and 1987 amendments.

The 1965 legislative history underlying HRS § 480–2 includes the following:

H.B. No. 136 would amend the Hawai'i Antitrust Act by adding a new section declaring unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. *The purpose of the bill is to provide the Attorney General with much needed authority to bring proceedings to enjoin unfair and deceptive business practices by which consumers are defrauded and the economy of the State is harmed.*

There has been established in the Attorney General's Office of a Fair Business Practices Division. That division has been assigned the responsibility for developing and administering an effective fair business program to protect both consumers and honest businessmen from fraudulent, unfair or deceptive business practices. The authority to stop and prevent practices of this nature, which H.B. No. 136 would provide, is essential to an effective fair business program.

*The Hawaii Antitrust Act now contains appropriate enforcement provisions, including authority to the Attorney General to bring proceedings to enjoin any violations of the provisions of the act. The amendment of the act,*

---

**21.** HRS § 480–1 (1993) defines "consumers" as "a natural person who, primarily for personal, family, or household purposes, purchases, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment."

**22.** In *Robert's Hawai'i*, this court also overruled the holdings in *Ai v. Frank Huff Agency, Ltd.*, 61 Haw. 607, 607 P.2d 1304 (1980), and *Island Tobacco Co. Ltd. v. R.J. Reynolds Tobacco Co.*, 63 Haw. 289, 627 P.2d 260 (1981), to the extent that they allowed a private right of action for unfair methods of competition under HRS § 480–2. 91 Hawai'i at 250 n. 26 & 251 n. 27, 982 P.2d at 879 n. 26 & 880 n. 27.

*as provided by H.B. 136, would make all of its enforcement provisions, except the criminal provisions, applicable to the amendment. Primarily, as indicated above, it would empower the Attorney General to maintain suits to enjoin the continuation of unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade and commerce.*

*Id.* at 250, 982 P.2d at 879 (emphases in original) (footnote, citation, and ellipses omitted) (quoting Hse. Stand. Comm. Rep. No. 55, in 1965 House Journal, at 538). With respect to the 1987 amendment, this court stated:

> The legislative history relating to the 1987 amendment also stated in relevant part:
>
> > The purposes of this bill were to establish definitions of "class action" and "de facto class action" and to make several amendments to Chapter 480, [HRS], including the following:
> >
> > (1) Provided that the $1,000 minimum recovery provision is only applicable to consumer suits based upon unfair or deceptive practices brought under Section 480–2, unfair and deceptive practices;
> >
> > . . . .
> >
> > (5) Provided that suits based upon unfair or deceptive acts or practices under Section 480–2 may be brought only by consumers, the Attorney General, or the Office of Consumer Protection, *in effect precluding its application to private disputes between businessmen.*
> >
> > Your Committee finds that current law is unclear and the procedure confusing. Upon further consideration, your Committee has made numerous amendments to the bill including the following:
> >
> > . . . .
> >
> > 2. *Amended Section 480–2,* [HRS], *by requiring that the court and Office of Consumer Protection shall be guided by rules, regulations, and decisions of the Federal Trade Commission and the federal court[s]* and by providing that it shall not be necessary to show that the proceeding or suit brought under this section would be in the public interest

> > and *that no other person other than a consumer, the Attorney General or the director of the Office of Consumer Protection may bring an action under this section. The amendment to Section 480–2 is intended to clarify actions of unfair and deceptive acts and is not intended to affect suits based upon unfair methods of competition[.]*

*Id.* at 250–51, 982 P.2d at 879–80 (ellipses, brackets, and emphases in original) (quoting Hse. Conf. Comm. Rep. No. 104, in 1987 House Journal, at 1053). Accordingly, this court "interpret[ed] the legislative history to the 1965 and 1987 amendments [as] *not* . . . recogniz[ing] or creat[ing] a private claim for relief under HRS § 480–13 for unfair methods of competition in violation of HRS § 480–2." *Id.* at 251, 982 P.2d at 880 (footnote omitted) (emphasis in original).

Thereafter, in 2002, the legislature passed Senate Bill No. 1320 (S.B. 1320), which was signed into law as Act 229, amending HRS § 480–2 by adding subsection (e), which provides: "*Any person* may bring an action based on unfair methods of competition declared unlawful by this section." *See* 2002 Haw. Sess. L. Act 229, § 2 at 916–17 (emphasis added). Section 6 of Act 229 stated that the Act "shall take effect upon approval." Act 229 was approved on June 28, 2002. *See* 2002 Haw. Sess. L. Act 229, at 918.

The plaintiffs maintain that the amendment effectively overruled only that portion of the decision in *Robert's Hawai'i* that held that the legislature did not extend a private right of action for claims of unfair methods of competition. *See Robert's Hawai'i*, 91 Hawai'i at 251, 982 P.2d at 880 ("[This court] . . . interpret[s] the legislative history to the 1965 and 1987 amendments *not* to recognize or create a private claim for relief . . . for unfair methods of competition in violation of HRS § 480–2. This interpretation in no way limits consumer claims of unfair or deceptive acts or practices under HRS § 480–2[.]" (Emphasis in original.)). Because, in the plaintiffs' view, the amendment "provided the clarification this [c]ourt invited in [*Robert's Hawai'i* ]," the plaintiffs submit that their claims of violation of HRS § 480–2 are not

limited to those acts committed after June 28, 2002.

We do not believe the amendment "overruled" *Robert's Hawai'i,* as the plaintiffs suggest, but instead simply provided a new right that did not previously exist. The House Committees on Consumer Protection and Commerce and Judiciary and Hawaiian Affairs stated:

> The purpose of [S.B. 1320] is to *permit* private actions for unfair methods of competition.... Your Committees find that only the Attorney General may bring an action to enforce the antitrust, or unfair methods of competition law.... *This bill amends the law to clearly give businesses and consumers the right to enforce the law if the Attorney General declines to commence an action based on the claim.*

Hse. Stand. Comm. Rep. No. 1118, in 2002 House Journal, at 1665 (emphases added); *see also* Sen. Stand. Comm. Rep. No. 448, in 2001 Senate Journal, at 1116–17 ("The purpose of [S.B. 1320] is *to allow a private citizen to bring an action based on unfair methods of competition.* ... Current law does not allow private individual actions based on unfair methods of competition, although actions based on unfair or deceptive acts or practices are allowed. This measure corrects that inconsistency which has produced uncertainty in the courts." (Emphasis added.)); Sen. Stand. Comm. Rep. No. 931, in 2001 Senate Journal, at 1295 ("Under current law, it is clear that consumers may bring a direct cause of action for unfair and deceptive practices, but unclear that consumers may bring a claim of unfair methods of competition. This measure would *add* that protective provision." (Emphasis added.)).

▆▆▆ The 2002 amendment clearly created a private claim for relief for unfair methods of competition for claims arising after the June 28, 2002 effective date. Neither the language of the statute itself nor the legislative history of the amendment give any ex-

pressed indication that the amendment should be applied retroactively. *See* HRS § 1–3 (1993) ("No law has any retrospective operation, unless otherwise expressed or obviously intended."); *Clark v. Cassidy,* 64 Haw. 74, 77 n. 6, 636 P.2d 1344, 1347 n. 6 (1981) ("It is a general rule in most jurisdictions that[ ] statutes or regulations which say nothing about retroactive application are not applied retroactively if such a construction will impair existing rights, create new obligations[,] or impose additional duties with respect to past transactions." (Citation omitted.)). Thus, retrospective application of HRS § 480–2(e) is not permitted inasmuch as the legislature did not expressly or obviously indicate its intention that HRS § 480–2(e) apply retroactively. Accordingly, we hold that the circuit court correctly concluded that the plaintiffs' claims of unfair methods of competition based upon HMSA's alleged wrongful acts *prior* to June 28, 2002 are barred inasmuch as HRS § 480–2(e) does not apply retroactively.

### b. *post–June 28, 2002 unfair methods of competition claims*

In its May 23, 2003 orders, the circuit court concluded that the plaintiffs' claims of unfair methods of competition occurring after June 28, 2002 are

> still fatally flawed because [they do] not involve claims of "competition" by HMSA. *HMA and its physician members are not "competitors" with HMSA and they are not in "competition" with HMSA.* Quite the opposite, HMA is a professional medical society whose members are physicians providing medical services that HMSA reimburses [and physician-plaintiffs are physicians who provide medical services that HMSA reimburses.[23]] Thus, [*the plaintiffs'] allegations are in reality nothing more than claims [of] unfair and deceptive practices, which, for the reasons stated above,* [24] *are clearly barred.*

---

**23.** Inasmuch as the circuit court's orders granting HMSA's motion for judgment on the pleadings in the HMA and Cooper Appeals are similar, we quote the order contained in the record of the HMA Appeal and incorporate in brackets the only statement that is different from the HMA Appeal's order.

**24.** The "reasons stated above" refers to the circuit court's conclusion the plaintiffs did not have standing to assert claims arising under HRS chapter 480 for unfair or deceptive acts or practices "because they are not consumers or other proper parties to bring such claims. The plain-

(Emphases added.) Further, in concluding that HMA "failed to show, and cannot show, antitrust injury standing as required by HRS [c]hapter 480," the circuit court stated:

> To establish "antitrust standing," HMA must allege a direct injury. HMA cannot meet this burden. Each and every allegation of harm suffered by HMA pertains either to a harm allegedly suffered directly by a physician member (*i.e.*, that physicians have not been reimbursed properly) or a harm HMA has suffered as a result of such a physician's alleged suffering (*i.e.*, by attending to the needs of its member physicians). HMA's repeated assertion that these injuries are "direct" does not make it so. Its injuries are derivative and remote by definition, and do not give rise to an antitrust claim.

On appeal, the plaintiffs argue that HRS § 480–2(a) does not require that they be "competitors" of HMSA; nor does it require that they be in competition with HMSA. Rather, the statute plainly states, "*Any person* may bring an action based on unfair methods of competition[.]" HRS § 480–2(e) (emphasis added). In addition, HMA asserts that the circuit court erred in concluding that HMA had failed to allege a direct cognizable "antitrust injury" because

> there can be no dispute that HMA has alleged a direct and palpable injury of the type sufficient to confer standing for claims both on its own behalf and on behalf of its members. As for its own injury, [HMA] alleges that it has been required to divert substantial resources and time to deal with its members' problems created by HMSA's conduct—resources that otherwise would go to support its principal mission in service of its members. [HMA] also has alleged that its members have been deprived of monies to which they are entitled, and their businesses are threatened by [HMSA's] ongoing wrongful conduct. It is difficult to imagine clearer examples of "injury to business or property."

tiffs have conceded in their legal memorandum that they do not seek to assert claims [of] 'unfair or deceptive acts or practices' under HRS § 480–2."

HMSA, however, contends that the claims of unfair methods of competition are still barred because: (1) the plaintiffs are not "competitors" of HMSA or in "competition" with HMSA; (2) the plaintiffs' allegations in support of their claims of unfair methods of competition are nothing more than claims of unfair and deceptive practices, which are barred, *see supra* notes 8, 12, and 24; and (3) HMA did not allege a cognizable injury under HRS § 480–2(a) to its "business or property."

### i. whether the plaintiffs must be competitors of, or in competition with, HMSA to bring claims of unfair methods of competition

In *Cieri v. Leticia Query Realty, Inc.*, 80 Hawai'i 54, 905 P.2d 29 (1995), this court stated that:

> Hawai'i antitrust and consumer protection law is an amalgam of the various prohibitions contained in the federal law; however, our consumer protection provisions bear the most resemblance to the 1938 amendments to Section 5 of the [FTCA]. Originally, the 1914 version of the FTCA limited the power of the [FTC] to prevent "unfair methods of competition." Act of Sept. 26, 1914, ch. 311, § 5, 38 Stat. 719. In 1938, however, Congress amended section 5 of the FTCA to give the FTC express authority over "unfair or deceptive act or practices." Act of March 21, 1938, ch. 49, § 3, 53 Stat. 111, amending Act of Sept. 26, 1914, ch. 311, § 5, 38 Stat. 719, codified at 15 U.S.C. § 45(a)(1) (1982). The 1938 amendment "created direct protection of consumer interests on a par with market competitors, heralded increased activity of the FTC in all aspects of commercial advertising with an interstate effect, and spurred parallel efforts by the states." VII E. Kintner, *Federal Antitrust Law*, § 49.1, 124 (1988).
>
> ... HRS § 480–2 is virtually identical to section 5 of the FTCA [25] and provided,

25. Section 5 of the FTCA, as amended, 15 U.S.C. § 45(a)(1), provides in relevant part:
> (1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or

very simply, that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." *Id.* at 60, 905 P.2d at 35 (citations omitted). We further recognized that,

> [f]rom the outset, it was clear that the focus of what would eventually be the spearhead of Hawai'i consumer protection law was on trade, commerce, and business:
>
> > Your committee recognizes, as did the Congress of the United States in 1914 when it enacted the [FTCA], that it is impractical to enact a law prohibiting each unfair method of competition or unfair or deceptive act or practice in the conduct of trade and commerce after the need therefor comes to light. In explaining the need for the broad language of the [FTCA], Congress said:
> >
> > > It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task. It is also practically impossible to define unfair practices so that the definition will fit business of every sort in every part of this country. Whether competition is unfair or not generally depends upon the surrounding circumstances of the particular case. What is harmful under certain circumstances may be beneficial under different circumstances.

*Id.* at 60–61, 905 P.2d at 35–36 (quoting Hse. Stand. Comm. Rep. No. 55, in 1965 House Journal, at 538) (citation and emphasis omitted).

Section 480–2, however, differs from section 5 of the FTCA in one essential aspect—enforcement. *See Robert's Hawai'i*, 91 Hawai'i at 249, 982 P.2d at 878 ("FTCA does not afford a private cause of action."). "Section 5 of the FTCA contains no private remedy, rather enforcement of its provisions is vested in the [FTC]." *Star Markets, Ltd. v. Texaco, Inc.*, 945 F.Supp. 1344, 1346 (D.Haw.1996) (citation omitted).

Hawaii's version ... contains a blanket authorization for private actions for damages sustained under any provision of ch. 480. HRS § 480–13(a). *Two distinct causes of action have emerged under § 480–2(a): 1) claims alleging unfair methods of competition; and 2) claims alleging unfair or deceptive acts or practices.*

In 1987, the Hawai'i legislature amended both §§ 480–2 and 480–13 to eliminate a prior requirement that a plaintiff show that the suit would be in the public interest. [26] Sen. Conf. Comm. Rep. No. 105, in [1987] Senate Journal, at 872. These amendments allow for even broader enforcement of ch. 480. In conjunction with this expansion, however, the legislature also amended § 480–2 by adding subsection (d) which limits enforcement of the unfair or deceptive acts or practices clause to consumers, the attorney general or the director of the officer of consumer protection. HRS § 480–2(d)[; *see also* Sen. Stand. Comm. Rep. No. 1056, in 1987 Sen-

---

26. The 1985 version of HRS § 480–13. provided in relevant part that:

> **§ 480–13 Suits by persons injured; amount of recovery, injunctions.** (a) Any person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by this chapter:
>
> (1) May sue for damages sustained by the person, and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorneys fees together with the

practices in or affecting commerce, are hereby declared unlawful.

cost of suit; <u>provided that no showing that the proceeding or suit would be in the public interest (as those terms are interpreted under section 5(b) of the [FTCA]) is necessary when the party against whom the proceeding or suit is brought is a merchant as that term is defined in chapter 490[.]</u> (Bold emphasis in original.) (Underscored emphasis added.) In fact, HRS § 480–2(c) (1993), as amended, specifically provides that:

> No showing that the proceeding or suit would be in the public interest (as these terms are interpreted under section 5(b) of the [FTCA]) is necessary in any action brought under this section.

ate Journal, at 1345 ("Your Committee also believes that private enforcement of antitrust laws is beneficial to the judicial process as it discourages violations and eases the burden on the attorney general's limited resources.")]. *The amendment denies businesses standing to sue under the "deceptive acts or practices" clause of § 480-2(a). However, no such limiting language was included for "unfair methods of competition" claims.*

*Id.* (citations omitted) (emphasis added). Moreover, even after this court's declaration in *Robert's Hawai'i* of no private right of action for unfair methods of competition, the legislature specifically retained the broad enforcement language for unfair methods of competition claims by adding subsection (e) to HRS § 480-2, which, as previously quoted, provides that *"[a]ny person* may bring an action based on unfair methods of competition declared unlawful by this section." (Emphasis added.) The legislative history explicitly indicates that "[t]his bill amended the law to clearly give *businesses and consumers* the right to enforce the law if the Attorney General declines to commence the action based on the claim." Hse. Stand. Comm. Rep. No. 1118, in 2002 House Journal, at 1665 (emphasis added). By its plain terms, HRS § 480-2(e) authorizes *any person, i.e.,* businesses and individual consumers, to bring an action grounded upon unfair methods of competition. To require that the plaintiffs in this case be competitors of HMSA would contravene the plain language of subsection (e) and the intent of the legislature in amending the subject statute. Accordingly, to the extent the circuit court premised its dismissal of the plaintiffs' unfair methods of competition claims on its conclusion that they "are not competitors [of]

27. Although the plaintiffs miss the mark in rebutting HMSA's argument, we note that this court, in examining HRS § 480-2 and section 5 of the FTCA, stated in *Island Tobacco Co.:*
 [W]e view section 480-2 as being designed to aid "competitors," as much as to protect "competition." And unlike the [FTCA], the policy of the Hawai'i law, as expressed in HRS [§ ] 480-13, *is to foster private suits grounded on unfair [ ] or deceptive trade practices, even where the unlawful acts [d]o not culminate in injury to "competition."*

HMSA," we hold that the circuit court erred. (Internal quotation marks omitted.)

Moreover, as previously stated, HMSA essentially maintains that, in order to sustain their claims of unfair methods of competition, the plaintiffs must also be *in competition with HMSA,* which they are not because

> [the plaintiffs] provide medical services that HMSA reimburses in accordance with PAR Agreements, and [the plaintiffs] want more money for themselves at the expense of HMSA and its patient members. Accordingly, there can be no violation here of the prohibition against "unfair competition" in Chapter 480.

In response to HMSA's contention, the plaintiffs merely retort that HRS § 480-2 does not require a showing of "harm to competition," but only that the unfair practice has caused injury to "a person." [27] However, having held that the plaintiffs need not be competitors of HMSA, it follows that they need not be "in competition" with HMSA. *See Fed. Trade Comm'n v. Raladam Co.,* 283 U.S. 643, 649, 51 S.Ct. 587, 75 L.Ed. 1324 (1931) ("[i]t is obvious that the word 'competition' imports the existence of present or potential competitors"), *superseded by statute on other grounds, Fed. Trade Comm'n v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). Thus, to the extent that the circuit court's dismissal is premised upon its conclusion that the plaintiffs "are not in competition with HMSA," we hold that the circuit court erred.

**ii. whether the plaintiffs can rely upon allegations of HMSA's unfair or deceptive acts or practices to support their claims of unfair methods of competition**

The plaintiffs alleged, *inter alia,* that:

> 63 Haw. at 301, 627 P.2d at 269 (emphasis added). As previously noted, *Island Tobacco Co.* was overruled by *Robert's Hawai'i,* 91 Hawai'i at 251 n. 27, 982 P.2d at 880 n. 27, to the extent that it allowed a private right of action for unfair methods of competition under HRS § 480-2. *See supra* note 22. The decision, however, remains valid with respect to the remainder of the discussion therein.

66. [HMSA] has engaged in unfair methods of competition that delay, impede, and/or deny lawful claims of reimbursement made by [the plaintiffs] who have entered into agreements with [HMSA].

67. [HMSA's] improper, unfair and deceptive acts constitute unfair methods of competition in material aspects. [The plaintiffs], unaware of [HMSA's] deception, rendered medically necessary services to [HMSA's] plan members, reasonably expecting to be fully reimbursed for such services in a timely fashion. As a result of [HMSA's] unfair methods of competition, however, [the plaintiffs] have been denied monies to which they are lawfully entitled for medical services rendered to [HMSA's] plan members. [28]

The circuit court concluded that the plaintiffs' "allegations are in reality nothing more than claims of unfair and deceptive practices, which ... are clearly barred [because the plaintiffs are not consumers]." However, in so concluding, the circuit court overlooked the fact that the plaintiffs may bring claims of unfair methods of competition based on conduct that would also support claims of unfair or deceptive acts or practices. Indeed, the United States District Court for the District of Hawai'i, in *Star Markets, Ltd. v. Texaco, Inc.*, 945 F.Supp. 1344 (D.Haw. 1996), was faced with the issue whether "conduct which supports a claim [of] deceptive acts or practices could also support a claim [of] unfair methods of competition." *Id.* at 1348. The U.S. district court answered in the affirmative, explaining that:

In *Kukui Nuts [of Hawai'i, Inc. v. R. Baird & Co., Inc.,* 7 Haw.App. 598, 789 P.2d 501 (1990) ], the Intermediate Court of Appeals determined that the defendants' alleged conduct constituted deceptive acts or practices under the definition in [HRS chapter] 481A[, entitled "Uniform Deceptive Trade Practice Act,] and such conduct also supported Kukui Nuts' § 480–2 claims [of] both unfair methods of competition and deceptive acts or practices. [*Id.*] at 611–12, 615, 789 P.2d at 511, 513. Under the law today, Kukui Nuts would lack standing to bring a § 480–2 claim [of] deceptive acts or practices. However, the standing limitation of § 480–2(d)[, limiting persons who may bring an action based upon unfair or deceptive acts or practices to consumers, the attorney general or the director of the office of consumer protection,] does not invalidate the court's determination that the same allegations could support claims [of] both §§ 481A and 480–2 unfair methods of competition.

... Likewise, this court finds [*In re Oxwall Tool. Co.*, 59 F.T.C. 1408, 1961 WL 65419 (1961),] to be instructive. In that case, tools manufactured in foreign countries were labelled in such a way that consumers could be confused and believe that they were manufactured domestically. The FTC adopted the decision of the hearing examiner that such conduct constituted both unfair methods of competition and deceptive acts or practices within the intent and meaning of the FTCA. 59 F.T.C. at 1413. From this language, the court finds that the FTC allows the same conduct to support claims for both clauses of § 5 of the FTCA.

*Thus, this court also finds that Plaintiff's allegations can support a § 480–2 unfair methods of competition claim. Whether Plaintiff's allegations also support a § 481A deceptive acts or practices claim makes no difference.*

*Id.* (emphasis added). Accordingly, we conclude that the plaintiffs may rely upon HMSA's alleged unfair or deceptive acts or practices to support their claims of unfair methods of competition.

However, notwithstanding the foregoing and our holding that the plaintiffs need not be "competitors" of, or "in competition" with, HMSA, the question remains whether the nature of the competition must be sufficiently alleged. Contrary to the dissent, we conclude that it does because, in the absence of such allegations, the distinction between claims of unfair or deceptive *acts or practices* and claims of unfair *methods of competition* that are based upon such acts or practices would be lost where both claims are based on

---

28. The physician-plaintiffs in the Cooper Appeal make the identical allegations in their complaint, except they are numbered as paragraphs 63 and 64, respectively.

unfair and deceptive acts or practices. In other words, the existence of the competition is what distinguishes a claim of unfair or deceptive acts or practices from a claim of unfair methods of competition. Based on our review of the plaintiffs' complaints, we believe the allegations contained therein sufficiently allege claims of unfair methods of competition based upon conduct that could otherwise support claims of unfair or deceptive acts or practices. For example, in addition to ¶¶ 66 and 67, quoted *supra,* the plaintiffs also allege:

11. ... *[HMSA's] conduct has adversely impacted, and continues to adversely impact, members of [HMSA's] plans* by, among other things: (a) imposing financial hardships on, and in some cases threatening the continued viability of, the medical practices run by [the plaintiffs]; (b) threatening the continuity of care provided to patients by [the plaintiffs], as required by sound medical judgment; (c) requiring [the plaintiffs] to expend considerable resources seeking reimbursement that could otherwise be available to provide enhanced healthcare services to [HMSA's] plan members; (d) making it more costly and difficult for [the plaintiffs] to maintain and enhance the availability and quality of care that all patients receive; and (e) increasing the costs of rendering healthcare services in Hawaii as a result of the additional costs incurred and considerable effort expended by HMA members in seeking reimbursement from HMSA for services rendered....

. . . .

21. In order to treat patients who are insured by HMSA, HMSA requires HMA members to enter into agreements with HMSA.

22. If physicians refuse to sign HMSA's one-sided agreements, *those physicians are effectively prevented* from seeing and treating patients, including long-time patients, who are covered for health insurance through one of HMSA's plans.

23. *Physicians who object* to provisions contained in HMSA's agreements are faced with an untenable choice: they can either accept the take-it-or-leave-it terms and provisions contained in the agreements that are unfair to both physicians and patients or they can choose to no longer treat patients, who they have developed long-term relationship with, who are insured by HMSA.

. . . .

25. *Through its market dominance and oppressive conduct,* HMSA has improperly and unfairly attempted to impose unconscionably low reimbursements upon physicians. Thus physicians are forced to either accept the unconscionably low reimbursement rates or to simply not contract with HMSA.

26. *HMSA dominates the enrollee market in Hawaii with over 65% of Hawaii's population enrolled in one of HMSA's plans. In this regard, HMSA is the largest provider of fee-for-service insurance in the State with more than 90% of the market and is the second largest HMO provider in the State. Similarly, HMSA dominates the physician market, with approximately 90% of Hawaii's physicians participating in HMSA's networks.*

27. *It is through such market dominance that HMSA is able to dictate the terms and amount of reimbursement HMA physicians will receive.* [29]

(Emphases added.) HMSA facilitates access to the dispensing of medical services, and the plaintiffs provide medical services directly. Thus, in our view, HMSA and the plaintiffs share the same goal or mission, *i.e.,* ensuring that medical services are accessible to their "customers." Their success in meeting the common goal—and, in turn, ensuring the profitability of their respective businesses—is dependent upon their ability to effectively provide medical services to their customers, *i.e.,* the patients. However, if HMSA en-

---

**29.** Again, as previously indicated, the allegations in the complaints filed by HMA and the physician-plaintiffs are nearly identical. The allegations quoted above are found in HMA's complaint, and the only difference in numbering is paragraph 11 above, which is numbered "7." in the physician-plaintiffs' complaint in the Cooper Appeal.

gages in acts or practices that impede or interfere with physicians' ability to provide effective healthcare services to their patients and/or create incentives for patients to look elsewhere for medical services—that is, to other participating physicians who may be reluctant to challenge HMSA or to non-participating physicians—such acts or practices can, if proven, constitute unfair methods of competition, notwithstanding the fact that the same conduct could also support a claim of unfair or deceptive acts or practices. For purposes of our analysis, we accept, as we must, the allegations in the plaintiffs' complaint as true, *see Aames Funding Corp. v. Mores*, 107 Hawai'i 95, 98, 110 P.3d 1042, 1045 (2005) ("[R]eview of a motion to dismiss is based on the contents of the complaint, the allegations of which we accept as true and construe in the light most favorable to the plaintiff." (Internal quotation marks, citation, and ellipsis omitted.)), and view such allegations in the light most favorable to them as the nonmoving parties, *see Ruf v. Honolulu Police Dep't*, 89 Hawai'i 315, 319, 972 P.2d 1081, 1085 (1999) (in motion for judgment on the pleadings, court is required "to view facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party" (citations omitted)).

 In sum, we hold that any person may bring a claim of unfair methods of competition based upon conduct that could also support a claim of unfair or deceptive acts or practices as long as the nature of the competition is sufficiently alleged in the complaint. Accordingly, we hold that the circuit court erred in concluding that the plaintiffs' post-June 28, 2002 claims are barred.

However, inasmuch as the circuit court's May 23, 2003 orders differed in one respect—that is, in the HMA Appeal case, the circuit court additionally concluded that HMA had failed to show injury for its claim of unfair methods of competition—we turn now to address the sufficiency of HMA's allegations of injury.

### iii. whether HMA sufficiently alleged injury to itself

In its May 23, 2003 order in the HMA Appeal case, the circuit court concluded, *inter alia*, that:

[E]ven if HMA's claims could otherwise be construed as claims [of] "unfair methods of competition," they are still barred because HMA has failed to show, and cannot show, antitrust injury and antitrust standing as required by HRS chapter 480.

To establish "antitrust injury," HMA must show injury of the type the antitrust law were intended to prevent and that flows from HMSA's alleged unlawful activities. Only a plaintiff who can show a significant threat of injury to his or her "business or property" from impending violations can obtain injunctive relief. HRS § 480–13(a)(2); *McCormack v. Nat['l] Collegiate Athletic Found[.]*, 845 F.2d 1338, 1341 (5th Cir.1988)[.]

. . . .

To establish "antitrust standing," HMA must allege a direct injury. HMA cannot meet this burden. Each and every allegation of harm suffered by HMA pertains either to a harm allegedly suffered directly by a physician member ... or a harm HMA suffered as a result of such a physician's alleged suffering. HMA's repeated assertion that these injuries are "direct" does not make it so. Its injuries are derivative and remote by definition, and do not give rise to an antitrust standing.

First, we note that we have already concluded, in section III.B., that HMA has standing to bring suit on behalf of its physician members and on its own behalf and, in section III.C., that HMA's post-June 28, 2002 claims of unfair methods of competition are not barred. Second, we note that HRS § 480–13(a) authorizes a plaintiff to seek damages and injunctive relief, providing that: "any person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by this chapter: (1) May sue for damages ...; and (2) May bring proceedings to enjoin the unlawful practices[.]"

In *Ai v. Frank Huff Agency, Ltd.*, 61 Haw. 607, 607 P.2d 1304 (1980), *overruled on other grounds, Robert's Hawai'i*, 91 Hawai'i at 250 n. 26, 982 P.2d at 879 n. 26, this court estab-

lished three elements essential to recovery under HRS § 480–13:(1) a violation of HRS chapter 480; (2) injury to the plaintiff's business or property resulting from such violation;[30] and (3) proof of the amount of damages.[31] *Id.* at 617, 607 P.2d at 1311; *see also Robert's Hawai'i,* 91 Hawai'i at 254, 982 P.2d at 883; *Beclar Corp. v. Young,* 7 Haw.App. 183, 194, 750 P.2d 934, 941 (1988). "[W]hile proof of a violation of chapter 480 is an essential element of an action under HRS § 480–13, the mere existence of a violation is not sufficient *ipso facto* to support the action; forbidden acts cannot be relevant unless they cause [some] private damage." *Robert's Hawai'i,* 91 Hawai'i at 254 n. 30, 982 P.2d at 883 n. 30 (citation and internal quotation marks omitted) (some brackets in original).

■■■ In the HMA Appeal, HMA maintains that, by alleging the "diminishment of financial resources," it had established "antitrust injury" to its business and property. In *Ai,* this court held that "it is unnecessary for plaintiffs[, in that case, the consumers] to allege commercial or competitive injury[;]" it is sufficient that plaintiffs allege that injury occurred to personal property through a payment of money wrongfully induced." 61

Haw. at 614, 607 P.2d at 1310. Therefore, HMA need only allege that, by reason of an antitrust violation, it has been injured in its "business or property." HMA did so when it alleged that, as a result of HMSA's unfair or deceptive practices, HMA was required to divert substantial resources and time to deal with its members' problems created by HMSA's conduct—"resources that otherwise would go to support its principal mission in service of its members." Clearly, HMA has sufficiently alleged "injury to business property." Accordingly, we hold that the circuit court erred in concluding that HMA failed to allege sufficient injury to its business or property.[32]

We emphasize, however, that this case comes before us not after a trial on the merits, but after a grant of a motion for judgment on the pleadings. As such, we are bound to construe the allegations in the complaint in favor of the pleader. *Ruf v. Honolulu Police Dep't,* 89 Hawai'i 315, 319, 972 P.2d 1081, 1085 (1999). It would, therefore, be inappropriate for this court to delve into HMA's ability or inability to prove damages as a result of its involuntary diversion of

**30.** The *Robert's Hawai'i* court stated that:

[F]ederal case law has interpreted the "injury to business or property" language of section 4 of the Clayton Act as a causation requirement, requiring a showing of "antitrust injury."

91 Hawai'i at 254 n. 31, 982 P.2d at 883 n. 31 (citation omitted).

**31.** We note that the *Ai* court set forth a fourth element—"a showing that the action is in the public interest or that the defendant is a merchant." *Id.* at 617, 607 P.2d at 1311. However, this case was decided before the 1987 amendment to HRS §§ 480–2 and –13 that eliminated this requirement. Sen. Conf. Comm. Rep. No. 105, in 1987 Senate Journal, at 872. Accordingly, the fourth "public interest" element is no longer required. *See also supra* note 27.

**32.** We also note that the circuit court's reliance upon the decision of the United States Court of Appeals for the Fifth Circuit, in *McCormack v. Nat'l Collegiate Athletic Ass'n,* 845 F.2d 1338, 1341 (5th Cir.1988), for its conclusion that HMA had not established "antitrust injury" is misplaced. *McCormack* involved an action brought by the university's alumni, football players, and cheerleaders (the plaintiffs) against a national athletic association for violations of antitrust and civil rights laws by promulgating and enforcing

rules that restricted benefits to be awarded to student athletes. *Id.* at 1339. The Fifth Circuit, in addressing the claims of two of the plaintiff-groups, *i.e.,* the university alumni and the cheerleaders, held that they had failed to satisfy the antitrust injury requirement in that:

The cheerleaders assert only the loss of the opportunity to lead cheers, which clearly does not qualify as an injury to business or property. The only injuries [the university alumni] allege[ ] are the devaluation of [their] degree[s], the loss of the opportunity to see football games, and the damages to [their] contact and association with current and prospective student athletes derived from [the] membership[.] Of these three, only the first is even arguably an injury to business or property.... [W]e cannot conclude that the devaluation of [the university alumni's] degree[s] is an injury for which the antitrust laws were designed to afford a remedy. The alleged connection, moreover, between the [national athletic association's] actions and the devaluation of [the] degree[s] presents the sort of "speculative" and "abstract" causal chain[.]

*Id.* at 1341–42. However, such is not the case here. HMA has clearly alleged a direct injury to its business, *i.e.,* the drain of HMA's financial resources.

resources caused by HMSA's alleged unfair methods of competition.

## 2. Tortious Interference with Prospective Economic Advantage

As previously stated, the circuit court concluded in its May 23, 2003 orders that the plaintiffs had not stated a claim of tortious interference with prospective economic advantage. Relying upon *Robert's Hawai'i* for the proposition that the plaintiffs must allege a relationship that is "definite, specific, and capable of acceptance" with "the potential to develop into a full contractual relationship," 91 Hawai'i at 258 & n. 40, 982 P.2d at 888 & n. 40, the circuit court concluded that the plaintiffs failed to "identify any such contract, potential contract, or third party."

On appeal, the plaintiffs argue that the circuit court committed reversible error when it held that, as a matter of law, a claim of tortious interference with prospective economic advantage requires the existence of a contract or a potential contract between the plaintiffs and a third party. In particular, the plaintiffs assert that, notwithstanding the fact that the court in *Robert's Hawai'i* recognized a claim of tortious interference with prospective economic advantage, the circuit court misconstrued *Robert's Hawai'i* as requiring the existence of a potential or actual contractual relationship, when, in fact, all that is required is a relationship that has a "reasonable probability of it maturing into a future economic benefit." 91 Hawai'i at 258, 982 P.2d at 887. It should be noted that HMA fails to make any argument challenging the circuit court's dismissal of the tortious interference of prospective economic advantage claim as it relates to HMA on behalf of *itself*. HMA's assertion that it "has alleged a colorable economic relationship with a third party, namely the doctor-patient relationship, with which HMSA's action have tortuously interfered" only applies to the physician members. Accordingly, the arguments raised by HMA are wholly derivative and too remote to support HMA's claim on behalf of itself. *See Fujimoto v. Au*, 95 Hawai'i 116, 139, 19 P.3d 699, 722 (2001) ("When the injury is derivative, recovery by the indirectly injured person is a form of double counting." (Internal quotation marks and citation omitted.)). Thus, our discussion below relates only to the physician-plaintiffs and HMA on behalf of its physician members [hereinafter, the physician-plaintiff/members].

The physician-plaintiff/members allege that an actual and ongoing prospective economic relationship existed between them (as physicians) and their patients and that the physician-plaintiff/members expected future economic benefit from such relationship. HMSA, however, challenges the specificity of the physician-plaintiff/members' tortious interference allegations in three respects. First, HMSA asserts that the physician-plaintiff/members must allege "the existence of a contract or potential contract." (Parenthesis omitted.) Next, HMSA contends that the physician-plaintiff/members must also identify a potential relationship with a specific third party, arguing that

> [the physician-plaintiff/members] may have hoped for, and encouraged, patients to come to them for care, but relationships with patients do not constitute an expectant contractual relationship because patients are free to change physicians at any time.

(Footnote omitted.) Finally, HMSA claims that the physician-plaintiff/members did not allege that HMSA *purposefully intended* to interfere with their prospective economic advantage based on their expectancy of ongoing relationships with their patients.

This court in *Robert's Hawai'i* "definitively recognized the intentional tort of tortious interference with prospective business advantage." 91 Hawai'i at 257, 982 P.2d at 886 (footnote omitted). In so doing, we stated that:

> *The primary objective of the tort of interference with prospective business advantage or opportunity is the protection of legitimate and identifiable business expectancies.* Weighing against social and individual interests in protection of business expectancies and efforts to acquire property are the interests in legitimate business competition. That is, much of the common law is premised on the theory that competitors should have an opportunity to com-

pete for business until such time as it is cemented by contract or agreement. Public and individual interests in free competition become particularly acute where a plaintiff anticipates, but is not yet assured, that a contractual or firm business relationship will materialize. Where the plaintiff's contractual relations are merely contemplated or. potential, the public interest is best served by allowing any competitor the opportunity to divert those prospects to itself, so long as the means used are not themselves improper. Any contrary rule may tend to establish and perpetuate trade monopolies. As the "expectancy" becomes more remote or less firmly established, the interest in free competition among business persons becomes more compelling.

*Id.* at 258, 982 P.2d at 887 (citation, ellipsis, and original emphasis omitted) (emphasis added). Consequently, and premised in part upon Restatement (Second) of Torts § 766B (1979),[33] the elements of the intentional tort of tortious interference with prospective business advantage are:

(1) the existence of a valid business relationship or a prospective advantage or expectancy sufficiently definite, specific, and capable of acceptance in the sense that there is a reasonable probability of it maturing into a future economic benefit to the plaintiff; (2) knowledge of the relationship, advantage, or expectancy by the defendant; (3) a purposeful intent to interfere with the relationship, advantage, or expectancy; (4) legal causation between the act of interference and the impairment of the relationship, advantage, or expectancy; and (5) actual damages.

*Robert's Hawai'i*, 91 Hawai'i at 258, 982 P.2d at 887 (citing *Locricchio v. Legal Servs. Corp.*, 833 F.2d 1352, 1357 (9th Cir.1987); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1166 (9th Cir.1997)) (other citation, footnote, and emphasis omitted). Specifically, the first element,

there must be a colorable economic relationship between the plaintiff and a third party with the potential to develop into a full contractual relationship. The prospective economic relationship need not take the form of an offer but there must be specific facts proving the possibility of future association.

*Locricchio,* 833 F.2d at 1357 (internal quotation marks and citation omitted) (emphases added). The second element mandates that the defendant have either "actual knowledge" of the expectancy or "knowledge of facts which would lead a reasonable person to believe that such interest exists." *Kutcher v. Zimmerman,* 87 Hawai'i 394, 406 n. 16, 957 P.2d 1076, 1088 n. 16 (App.1998) (citation and internal quotation marks omitted). The third element—intent—"denotes purposefully improper interference," *Omega Envtl., Inc.,* 127 F.3d at 1166 (emphasis and citation omitted), and requires a state of mind or motive more culpable than mere intent." *Locricchio,* 833 F.2d at 1358 (citation omitted). In other words,

[t]he plaintiff must prove that the defendant either pursued an improper objective of harming the plaintiff or used wrongful means that caused injury in fact. Asserting one's rights to maximize economic interests does not create an interference of ill will or improper purpose.

*Omega Envtl., Inc.,* 127 F.3d at 1166 (citation and internal quotation marks omitted).

Here, the physician-plaintiff/members alleged that:

75. [The physician-plaintiff/members] have reasonably expected that they would be compensated for rendering medically necessary healthcare services to [HMSA's] enrollees in a fair and timely manner. Consistent with this expectation, [the physician-plaintiff/members] have pursued such compensation by providing medically

---

**33.** Section 766B defines the tort of "Intentional Interference with Prospective Contractual Relation" as follows:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

necessary healthcare services to [HMSA's] enrollees.

76. However, contrary to the reasonable expectations of [the physician-plaintiff/members], and as set forth herein, [HMSA] maliciously, intentionally, and without justification or excuse, engaged in numerous improper, unfair and deceptive acts or oppressive business practices [*see; e.g.,* ¶ 4 of the plaintiffs' complaints, quoted *supra,* in section I.A.1.] designed to delay, deny, impede and reduce lawful reimbursement to [the physician-plaintiff/members] who are participating physicians in [HMSA's] networks and who have rendered medically necessary health care services to members of [HMSA's] managed care plans. [HMSA] has thus tortiously interfered with the prospective economic advantage [the physician-plaintiff/members] reasonably expected to realize from their relationship with [HMSA's] enrollees.

77. As a direct result of [HMSA's] unfair and deceptive acts and unfair methods of competition, [the physician-plaintiff/members] have been denied reimbursement which they reasonably expected and to which they were lawfully entitled.

78. By being denied such reimbursement, [the physician-plaintiff/members] have been damaged and will continue to suffer damage absent an injunction. [34]

As previously stated, the physician-plaintiff/members maintain that the above allegations are sufficient to sustain claims against HMSA for tortiously interfering in their doctor-patient relationships, thereby disrupting their prospective economic advantage with their patients. For the reasons discussed *infra,* we agree.

**First**, in order to state a claim of tortious interference with prospective economic business advantage, the physician-plaintiff/members must allege the existence of "a colorable economic relationship," *Locricchio,* 833 F.2d at 1357 (citation and internal quotation marks omitted), with "a reasonable probability of it maturing into a future economic benefit," *Robert's Hawai‘i,* 91 Hawai‘i at 258, 982 P.2d at 887 (citation omitted).

> *It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract.* It may include prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial benefits in recognition of a moral obligation.

Restatement (Second) of Torts § 766B cmt. c (1979) (emphasis added); *see also Hannex Corp. v. GMI, Inc.,* 140 F.3d 194 (2d Cir. 1998). Moreover, at this stage of the litigation where the physician-plaintiff/members need only articulate the requisite elements of tortious interference in a "short and plain statement," HRCP Rule 8(a)(1) (2004), their failure to identify the third party or parties by name is not fatal. "[A] plaintiff need only identify a specific class of prospective third parties to establish a tortious interference claim." *Re/Max Int'l, Inc. v. Smythe, Cramer Co.,* 265 F.Supp.2d 882, 891 (N.D.Ohio 2003); *Knapp v. McCoy,* 548 F.Supp. 1115, 1117 (N.D.Ill.1982); *Parkway Bank & Trust Co. v. City of Darien,* 43 Ill.App.3d 400, 2 Ill.Dec. 234, 357 N.E.2d 211, 214–15 (1976). In other words, the physician-plaintiff/members are not required to specifically identify (*i.e.,* name) the third party with whom they have a business expectancy in order to satisfy the pleading requirements. *See Celex Group, Inc. v. Executive Gallery, Inc.,* 877 F.Supp. 1114, 1125 (N.D.Ill.1995).[35] In sum,

34. As with their claims of unfair methods of competition, the physician-plaintiffs in the Cooper Appeal make the identical allegations in their complaint, except that they are numbered as paragraphs 83 through 86.

35. We note, however, that the physician-plaintiff/members will eventually be required to present more specific details in order to support their claims. For example, in *Celex Group,* sellers of motivational products brought an action against a competitor who sold executive products and also purchased items and sold items to sellers, asserting a variety of intellectual property and contractual claims. 877 F.Supp. at 1117, 1119. The competitor (the counterclaim-plaintiff) counterclaimed, alleging, *inter alia,* tortious interference with business opportunity in connection with seller's entry into the airline advertising market used by the counterclaim-plaintiff. *Id.* at 1118, 1123. Specifically, the counterclaim-plaintiff alleged that, "by invading [its] allegedly exclusive airline advertising province, [the sellers] intentionally interfered with [the counterclaim-plaintiff's] business expectancies with its

the physician-plaintiff/members are not required to allege the existence of a potential or actual contract, nor are they required to specifically name the third party with whom they have a business expectancy, provided that they have alleged a relationship or potential relationship that "would have inured to [their] economic benefit." *Locricchio*, 833 F.2d at 1357. Here, the physician-plaintiff/members sufficiently alleged a "prospective economic advantage" in their complaints that they "reasonably expected to realize from their relationship with [HMSA's] enrollees," *i.e.*, their patients. *See supra* ¶¶ 76 and 84, respectively, of the plaintiffs' complaints.

■ Second, with respect to the "knowledge" element, the physician-plaintiff/members are obligated to allege that HMSA had "actual knowledge" or "knowledge of facts which would lead a reasonable person to believe" that an expectancy on the part of the physician-plaintiff/members of a reasonable future economic benefit existed. *Kutcher*, 87 Hawai'i at 406 n. 16, 957 P.2d at 1088 n. 16 (citation and internal quotation marks omitted). In their complaints, the physician-plaintiff/members alleged, *inter alia*, that:

3. In addition, as a result of the extraordinary unequal bargaining positions between HMA members and [HMSA], and the physicians' reliance on HMSA to provide access to significant portions of their patient base, HMSA has been able to force [the physician-plaintiff/members] to enter into one-sided agreements which infringe upon the physician-patient relationship and threaten the continuity of care physicians provide their patients.

At this stage of the litigation, the physician-plaintiff/members have adequately asserted that requiring physicians to enter into the PAR Agreements as a prerequisite to gaining access to patients who receive healthcare through HMSA imparts "knowledge" or "knowledge of facts" that made or should have made HMSA reasonably aware of the physician-plaintiff/members' expectancy of a future economic benefit.

■ Lastly, the physician-plaintiff/members alleged that HMSA "maliciously, intentionally, and without justification or excuse, engaged in numerous unfair and deceptive acts and oppressive business practices" designed to delay, deny, impede, and reduce lawful reimbursement to them and that such conduct has injured the physician-plaintiff/members and disrupted their relationships with their patients. The physician-plaintiff/members assert that:

Such intent is alleged and will be established, for example, through HMSA's unreasonable reimbursement rates which are often too low to even cover overhead expenses; through HMSA's automatic and improper downcoding of physician claims to reduce[ ] reimbursements; and through its improper application of black box edits, which results in denial of claims when certain codes or combinations of codes are submitted for reimbursement. These allegations are sufficient to allege HMSA's purposeful interference in the doctor-patient relationship.

(Citations to the record omitted.) Taking the allegations as true and in the light most favorable to the physician-plaintiff/members, we believe that they have sufficiently alleged "a purposeful intent." *Robert's Hawai'i*, 91

past and prospective customers." *Id.* at 1123 (internal quotation marks omitted). The United States District Court for the Northern District of Illinois granted summary judgment where the counterclaim-plaintiff did not even "attempt[ ] to identify any specific third parties with whom it had a reasonable business expectancy" but rather relied on "past and prospective corporate executive customers" as an "identifiable class." *Id.* at 1125 (internal quotation marks omitted). The court stated:

Although [the counterclaim-plaintiff's] past and prospective corporate executive customers may constitute an identifiable class for purposes of allowing [the counterclaim-plaintiff]

to defeat a motion to dismiss, [the counterclaim-plaintiff] must come forward with its evidence and identify particular third parties with whom it had a reasonable expectancy of entering into business to defeat a motion for summary judgment.

*Id.* The court also noted that requiring the identification of a specific party makes sense because a party also must show that a particular contractual or business relationship is contemplated. *Id.* at 1126 n. 19. Were it not for this requirement, "liability under a theory of tortious interference with prospective business expectancies would be virtually without limit and impossible to calculate." *Id.*

Hawai'i at 258, 982 P.2d at 887 (citation omitted).

In sum, the complaints assert that: (1) an actual and ongoing prospective economic relationship existed between the physician-plaintiff/members ' and their patients; (2) they expected a reasonable future economic benefit from the relationship; (3) by requiring the physician-plaintiff/members to enter into the PAR Agreements, HMSA was aware or should have been reasonably aware of their expectancy of a future economic benefit; (4) HMSA "maliciously [and] intentionally" disrupted their relationships with their patients by delaying, denying, and reducing reimbursement; and (5) such disruption has imposed serious financial hardships upon the physician-plaintiff/members, thereby causing damage. We, therefore, conclude that the allegations made by the physician-plaintiff/members' in their respective complaints, as quoted *supra*, satisfy the rudimentary pleading requirement for their claims of tortious interference with prospective economic advantage. Accordingly, we hold that the circuit court erred in dismissing their claims. On remand, the physician-plaintiff/members may proceed with their claims of tortious interference with prospective economic advantage, keeping in mind the observations made by the court in *Celex Group*. *See supra* note 37.

## IV. CONCLUSION

Based on the foregoing, we affirm in part and vacate in part the June 6, 2003 final judgments in appeal Nos. 25923 and 25924 as follows: (1) we affirm (a) the dismissal of the plaintiffs' claims of unfair methods of competition based upon HMSA's alleged wrongful conduct prior to June 28, 2002 and (b) any other rulings of the circuit court that (i) are not the subject of the current appeals, *e.g.*, the dismissal of the plaintiff-physicians' claims of unjust enrichment, or (ii) were rendered moot by our decision today, *e.g.*, the rulings related to the plaintiff-physicians' discovery requests; and (2) we vacate the remaining portions of the final judgments and remand the cases for further proceedings consistent with this opinion.

Concurring and Dissenting Opinion by ACOBA, J., with whom NAKAYAMA, J., Joins.

I concur, except I disagree that HMSA and HMA must be in competition as the majority indicates. Majority opinion at 1212. HMSA and HMA need not be in competition, nor is it necessary that their relationship with respect to those they serve be categorized as one with "customers." Majority opinion at 1212–1213. While a mutual goal may in the most general sense be to "ensur[e] that medical services are accessible," *id.*, the roles played by HMSA on the one hand, and HMA and the individual plaintiffs on the other, in the medical delivery system are plainly dissimilar. As the plaintiffs allege, "HMSA is the largest provider of fee-for-services insurance in the State[.]" On the other hand, the individual plaintiffs are physicians and HMA is an association of physicians whose profession is to provide medical treatment and care to individual patients.

I see no similarity in societal function between the two contending sides that places them in competition for Hawai'i Revised Statutes (HRS) chapter 480 purposes. HRS § 480–2(e) broadly provides that "*any person* may bring an action based on unfair methods of competition declared unlawful by this section." (Emphasis added.) In my view it is sufficient that "unfair methods of competition" adversely impact the plaintiffs and allegations in that respect are made, beyond any allegations of unfair and deceptive acts or practices. I do not believe that allegations that the plaintiffs are in competition with the defendants is a prerequisite to a claim under HRS § 480–2(e). Thus it is unnecessary to allege, as the majority indicates, that HMSA and all the plaintiffs are in competition with each other for the same "customers." Majority opinion at 1212–1213.